**18-3421 (L)**
*United States v. Skelos*

# In the
# United States Court of Appeals
## For the Second Circuit

————

AUGUST TERM, 2019

ARGUED: FEBRUARY 13, 2020
DECIDED: FEBRUARY 23, 2021

Nos. 18-3421-cr, 18-3442-cr

UNITED STATES OF AMERICA,
*Appellee,*

*v.*

DEAN SKELOS, ADAM SKELOS,
*Defendants-Appellants.*

————

On Appeal from the United States District Court
for the Southern District of New York.

————

Before: WALKER, SACK[*], AND CARNEY, *Circuit Judges.*

————

[*] Circuit Judge Ralph K. Winter, originally a member of this panel, died on December 8, 2020. Circuit Judge Robert D. Sack has replaced Judge Winter on the panel for this matter. *See* 2d Cir. IOP E(b).

Defendants-Appellants Dean and Adam Skelos, father and son, appeal from their convictions on multiple public corruption charges entered in the United States District Court for the Southern District of New York (Kimba Wood, *J.*). Dean and Adam Skelos primarily challenge the government's reliance on the "as opportunities arise" theory of bribery and the district court's related jury instructions. They also challenge the appropriateness of the Southern District of New York as a venue, whether one of their statutes of conviction, 18 U.S.C. § 666, permits conviction for the acceptance of gratuities, the district court's decision to quash certain subpoenas, and the district court's denial of an evidentiary hearing to explore alleged government leaks of grand jury information. Adam Skelos separately argues that certain evidence was unduly prejudicial and that there was insufficient evidence to convict him on certain public corruption charges because he lacked knowledge of the specific official acts that Dean Skelos allegedly promised in exchange for benefits to Adam Skelos. We conclude that Dean and Adam Skelos's arguments are without merit. Accordingly, we **AFFIRM** the judgments of conviction in their entirety.

————

ALEXANDRA A.E. SHAPIRO, (Fabien M. Thayamballi, *on the brief*), Shapiro Arato Bach LLP, New York, NY, *for Defendant-Appellant Dean Skelos*.

Theodore Sampsell-Jones (*on the brief*), Mitchell Hamline School of Law, St. Paul, MN, *for Defendant-Appellant Dean Skelos*.

JOHN J. KENNEY, (Julian S. Brod, Allison N. Angel, *on the brief*), Hoguet Newman Regal & Kenney, LLP, New York, NY, *for Defendant-Appellant Adam Skelos*.

THOMAS MCKAY, (Edward Diskant, Douglas Zolkind, Won S. Shin, *on the brief*), Assistant United States Attorneys, *for* Audrey Strauss, United States Attorney for the Southern District of New York, *for Appellee*.

————

JOHN M. WALKER, JR., *Circuit Judge*:

Defendants-Appellants Dean and Adam Skelos, father and son, appeal from their convictions on multiple public corruption charges entered in the United States District Court for the Southern District of New York (Kimba Wood, *J.*). Dean and Adam Skelos primarily challenge the government's reliance on the "as opportunities arise" theory of bribery and the district court's related jury instructions. They also challenge the appropriateness of the Southern District of New York as a venue, whether one of their statutes of conviction, 18 U.S.C. § 666, permits conviction for the acceptance of gratuities, the district court's decision to quash certain subpoenas, and the district court's denial of an evidentiary hearing to explore alleged government leaks of grand jury information. Adam Skelos separately argues that certain evidence was unduly prejudicial and that there was insufficient evidence to convict him on certain public corruption charges because he lacked knowledge of the specific official acts that Dean Skelos allegedly promised in exchange for benefits to Adam Skelos. We conclude that Dean and Adam Skelos's arguments are without merit. Accordingly, we **AFFIRM** the judgments of conviction in their entirety.

**BACKGROUND**

The factual background of this appeal, as presented at the second trial, is essentially undisputed.  From 2011 to 2015, Dean Skelos, a Republican senator from Nassau County, was the Majority Leader of the New York State Senate. Among other things, the Majority Leader is responsible for making decisions on Senate committee memberships and chairmanships, advancing bills out of committees, determining the bills that make it to the Senate floor for a vote, and, along with the Speaker of the Assembly and the Governor, developing the New York State budget.  As Majority Leader, Dean Skelos was highly influential in his home district because the state government provides financial assistance to counties and must approve certain county-level actions, such as modifications of tax laws.  Relevant to this appeal, Adam Skelos is the adult son of Dean Skelos.[1]

The Glenwood Scheme

In late 2010, while serving in the New York State Senate but before he assumed his position as Majority Leader, Dean Skelos attended a meeting at Glenwood Management, a New York-based real estate company.  At that meeting, Glenwood's founder Leonard Litwin and Glenwood General Counsel Charles Dorego discussed with Skelos rent regulation legislation, including the Senate's periodic renewal of Section 421-a, a state tax abatement.  Section 421-a was critical to Glenwood's business, and Glenwood personnel lobbied extensively to ensure that the provision remained in effect.  Glenwood personnel understood that Section 421-a could be changed in ways that would affect Glenwood's business. Skelos assured those present that the Section 421-a renewal would easily pass the Senate.  At the conclusion of the meeting, Skelos asked Litwin and Dorego if they

---

[1] Throughout this opinion, we also will refer to Dean Skelos as Skelos and Adam Skelos as Adam.

could help Adam break into the title insurance business by "throw[ing] some title work his way."[2]  Litwin sent Dorego to meet with Adam, but Dorego did not offer any work or compensation to Adam following the meeting.

In March 2011, Dean Skelos met again with Glenwood personnel and, this time, with representatives of the Rent Stabilization Association (RSA), a trade organization of residential landlords.  Those at the meeting discussed renewals of rent regulations and Section 421-a, including possible changes to these laws.  At the end of the meeting, Skelos again asked Litwin and Dorego if they could find some title insurance work for Adam.  Litwin again asked Dorego to meet with Adam, and Dorego scheduled a meeting for May 6, 2011.

On May 5, 2011, the day before Dorego's meeting with Adam, Glenwood personnel met with Skelos to discuss competing positions surrounding the rent regulation and Section 421-a renewals.  At the end of that meeting, Dorego told Skelos that Dorego would find a job for Adam with AbTech Industries, an environmental technology company that specializes in supporting counties' water treatment plants.  Dean Skelos thanked Dorego for seeing Adam.  The next day, at his meeting with Adam, Dorego offered to find a job for Adam with AbTech, in which Litwin's family and Dorego were stockholders and where Dorego had connections.

In June 2011, Dorego travelled to Albany to meet with Skelos at the end of the legislative session, when the rent regulation and Section 421-a legislation was being finalized. Outside his office, Skelos told Dorego that Section 421-a was going to be fine but that Adam starting with AbTech was going to take a long time. Skelos asked Dorego to find Adam other work in the meantime. Skelos later called

---

[2] App. at 4379.

Dorego to let him know that Section 421-a was extended and that the rent regulations were being renewed in a way that would be favorable to Glenwood.

Skelos asked Dorego to provide work for Adam on five more occasions, one of which followed a meeting explicitly about rent regulations. On another occasion, after receiving an email from Adam complaining that Dorego had not found title insurance work for him, Skelos called Glenwood's chief lobbyist to make it clear that he really wanted Dorego to find title insurance work for Adam. At trial, Dorego testified that Skelos's conduct came off as "more like a soft demand" than a "request."[3] Skelos, however, never explicitly threatened Glenwood personnel or explicitly linked particular legislative outcomes to Dorego's assistance to Adam.

In advance of an October 2012 meeting with Skelos, Dorego emailed Adam saying that he could refer $20,000 of business to Adam. At the October meeting, Skelos thanked Dorego for what he did for Adam. In February 2013, an executive with American Land Services (ALS), a company with which Glenwood did business, handed an envelope containing a $20,000 check to Adam at a Long Island restaurant, even though Adam had done no work for ALS and had never discussed or met with the company about work on any particular deal. Adam took the check and never discussed it again with ALS personnel.

In the months leading up to the $20,000 payment, Glenwood personnel also helped finalize the terms of a contract between Adam and AbTech. Skelos discussed AbTech's proposed terms with Adam and had several calls with Glenwood's chief lobbyist the same day.

---

[3] *Id.* at 4486.

Meanwhile, in November 2012, at the urging of Glenwood personnel, AbTech retained Adam Skelos on a $4,000-per-month consulting contract, even though, as Adam himself said on a recorded phone call, he "literally kn[e]w nothing about water or . . . any of that stuff."[4]  Adam's role with AbTech was described as assisting it with legislative matters in the state of New York and other government relations work related to storm water legislation.

The AbTech Scheme

In April 2013, AbTech submitted a bid in response to a Nassau County request for proposal (RFP) for a storm water project.  The company's bid was a top priority that required it to expend "substantial resources" for several weeks.[5] AbTech personnel knew that other companies were going to submit bids, but Adam assured them that there would be no competition.

Four days after bids were due, Adam called Dorego, livid that the AbTech engineers were going to make more money from the proposed project than he was. Adam informed Dorego that he had spoken to his father and that, unless Adam made more money, pushing the RFP through would not be worth it for Adam and Skelos.  Dorego then emailed AbTech's CEO as follows:

> I'm told he's about 45 days away from producing the legislation and the RFP to do up to ten million project with you.  He's hesitant (and his dad called) to do it with the engineer's [sic] making more money than him.  If he

---

[4] *Id.* at 7279.

[5] *Id* at 4974.

> doesn't get like a 4% commission I think they don't think
> it's worth pushing through.[6]

Dorego admitted at trial that this was an "extortionist" threat to the company.[7] AbTech's Vice President also interpreted this email as a threat because Dean Skelos had the ability to produce state legislation relevant to the Nassau County contract that could impact the contract's value to AbTech. Even though Adam was not contractually entitled to a raise, the company increased Adam's monthly compensation from $4,000 to $10,000 after Nassau County accepted AbTech's bid.

Skelos later told Adam that he would pass legislation specific to the storm water issue, which Adam conveyed to AbTech personnel. Skelos's office then proposed changes to the New York state budget to provide funding for storm water infrastructure projects. When the state budget was adopted, AbTech was assured that the storm water project contract would be funded.

<u>The PRI Scheme</u>

At a fundraiser in late 2010, Dean Skelos asked Anthony Bonomo, the CEO of Physician's Reciprocal Insurers (PRI), a New York-based medical malpractice insurer, if Bonomo could send work to U.S. Legal Support, a company with which Adam was involved. Bonomo felt that he should do it because Skelos was a state senator, and PRI had important legislation up for consideration. Bonomo testified that the most "critical" piece of this pending legislation was the periodic renewal of so-called "extenders" legislation, which he would talk about "[a]ny time [he]

---

[6] Suppl. App. at 10.

[7] App. at 4557.

was in the Senator's presence."[8]  The extenders legislation prevented the New York State Department of Financial Services from shutting down medical malpractice insurers carrying negative balances, and PRI was the only such insurer.  Because the legislation periodically expired, it had to be extended repeatedly to protect PRI.

Bonomo, following requests by Skelos, accordingly directed work to U.S. Legal Support.  Throughout 2011 and 2012, both Skelos and Adam thanked Bonomo for sending work to U.S. Legal Support but asked Bonomo to look into whether PRI could do more for them.  In August 2012, Skelos told Bonomo at a meeting that Adam needed both a job and health benefits.  Bonomo proposed that Adam take a job with PRI, and Bonomo and Skelos discussed legislation that same day.  At later events during which Bonomo and Skelos discussed legislation, Bonomo reminded Skelos that he had offered Adam a job.

In January 2013, as Bonomo had arranged, Adam began the full-time job at PRI with regular, in-office hours purportedly selling insurance to physicians, hospitals, and clinics even though he did not have a license to sell insurance.  He was employed at will with an annual salary of $78,000.  Adam stayed in this position until late April 2013, even though he never worked a full day and failed to show up most days. When questioned by his supervisor about his repeated absences from work, Adam referred the supervisor to his father's arrangement with Bonomo.  After Adam's relationship with his supervisor predictably soured, Adam complained to his father.  Skelos called Bonomo to express his own discontent and told Bonomo to work it out.  Bonomo did not fire Adam because, he testified, he "had legislation up in Albany and based on the conversation [he]

---

[8] *Id.* at 5570.

had with the senator, [he] didn't want to do anything that [he] feared would put that in jeopardy."[9]

Instead of firing Adam, Bonomo, with Skelos's consent, transferred Adam to a similar position as a consultant that paid somewhat less but did not require Adam to go to the office. Adam's new contract began in October 2013 and was slated to end in March 2015. Adam underperformed in this job as well, making 10 to 12 telemarketing calls a week when he was required to make at least 100. To Bonomo's knowledge, Adam never sold an insurance policy for PRI.

Throughout the time that PRI employed Adam, Bonomo had lobbying meetings with Skelos. Any time Bonomo saw Skelos, Skelos thanked Bonomo and told Bonomo how important Adam was to him. During the same period, on three occasions, Skelos permitted Senate votes on, and voted for, renewal of the extenders legislation that was so critical to PRI. Skelos, however, never overtly threatened PRI personnel or overtly linked Bonomo's employment of Adam with particular legislative outcomes.

In January 2015, before the end of his contract with PRI and after the government began to investigate the activities of Skelos and his son, Adam called Bonomo to tell him that he and his father were having a problem with the government, and that he wanted to know what to do with checks he had received from PRI. After Bonomo told Adam "to rip those checks up," Adam said he would do so.[10]

---

[9] *Id.* at 5527.

[10] *Id.* at 5667.

<u>Convictions</u>

In December 2015, a jury found Dean and Adam Skelos guilty, with respect to the Glenwood, AbTech, and PRI schemes, of: (1) conspiracy to commit extortion under color of official right, in violation of 18 U.S.C. § 1951 (Count One); (2) extortion under color of official right (i.e., Hobbs Act extortion), in violation of 18 U.S.C. §§ 1951 and 2 (Counts Three, Four, and Five); (3) conspiracy to commit honest services fraud, in violation of 18 U.S.C. § 1349 (Count Two); and (4) solicitation and acceptance of bribes and gratuities, in violation of 18 U.S.C. §§ 666 and 2 (Counts Six, Seven, and Eight). After sentencing, the defendants appealed.

In 2016, with the appeal pending, the Supreme Court decided *McDonnell v. United States*, which narrowed the definition of the "official act" that a public official must exchange for benefits in order to be convicted of Hobbs Act extortion or honest services fraud, where those crimes have been defined by reference to the term "official act" in the federal bribery statute, 18 U.S.C. § 201.[11] Because the *McDonnell* definition conflicted with the broader definition used by the district court and the government at trial, we ordered a new trial.[12] In the same decision, we rejected the defendants' challenges to the sufficiency of the evidence in support of their convictions.[13]

On July 17, 2018, a second jury, receiving the modified instructions, convicted Dean and Adam Skelos on all counts. The district court sentenced Dean

---

[11] 136 S. Ct. 2355, 2367–68 (2016).

[12] *United States v. Skelos*, 707 F. App'x 733, 738 (2d Cir. 2017).

[13] *Id*.

and Adam to imprisonment for 51 and 48 months, respectively, and fined Dean Skelos $500,000.  This appeal followed.

## DISCUSSION

The central issue on appeal is (1) Dean and Adam Skelos's challenge to the jury instructions in the wake of *McDonnell*.  Both Dean Skelos and Adam also challenge: (2) the validity of the indictment against them; (3) the appropriateness of the Southern District of New York as the venue for their prosecution in light of negative publicity there; (4) the permissibility of their convictions for acceptance of gratuities under 18 U.S.C. § 666; (5) the district court's decision to quash certain subpoenas; and (6) the district court's denial of an evidentiary hearing on alleged government leaks of grand jury information.  Adam separately challenges: (7) the admissibility of certain evidence used against him; and (8) the sufficiency of the evidence to convict him on charges relating to Glenwood and PRI.  The arguments of both defendants are without merit.

## I.      Jury Instructions

The defendants argue that the jury instructions pertaining to the Hobbs Act extortion counts were deficient for two reasons: (1) the "as opportunities arise" theory of bribery upon which the government relied is no longer valid after *McDonnell*, and (2) even if that theory is valid, the instructions did not require the jury to find that the matters upon which Dean Skelos was expected to take official action had been identified with the requisite precision at the time he accepted each relevant bribe.[14]  Accordingly, the defendants argue that their convictions must be

---

[14] Defendant-Appellant Dean Skelos's Br. at 23–24.  The defendants further argue that any error in the district court's instructions pertaining to the Hobbs Act counts (One, Three, Four, and Five) infected the entirety of the jury instructions because of the cross-referential nature of some

vacated. We review jury instructions *de novo* for error, but will not vacate a conviction due to an erroneous jury charge if the error was harmless.[15] Because we find that any error in instructing the jury was harmless, we decline to vacate the convictions.

The district court charged the jury:

> The government must prove beyond a reasonable doubt that Dean Skelos obtained property to which he was not entitled by his public office, knowing that it was given in exchange for official acts as the opportunities arose. The government must also prove, beyond a reasonable doubt, that the person giving the property was motivated, at least in part, by the reasonable expectation that in exchange for the payment, Dean Skelos would perform official acts for the benefit of that party, as opportunities arise, and that Dean Skelos was aware of that motivation and intended for the other party to believe that he would perform official acts in exchange for the property.

> If either the person giving the property or Dean Skelos understood that the property was given solely to cultivate goodwill, or to nurture a relationship, then this element has not been proven, even if Dean Skelos later

---

the jury instructions given regarding the bribery counts. *Id.* at 22. Because we will find the instructional error harmless, we need not parse this argument.

[15] *Silver*, 948 F.3d at 547.

> performed some act that was beneficial to the giver. . . .
> On the other hand, if you find that a person gave
> property to Dean Skelos intending, at least in part, to
> receive official action in exchange, and that Dean Skelos
> accepted the property intending for the giver to believe
> that Dean Skelos would take official action in exchange,
> then this element has been satisfied.[16]

The district court also expanded on the definition of "official act or action":

> An official act or action is a decision or action on a
> specific matter that may be pending or may, by law, be
> brought before a public official.  An official act or action
> must involve a decision, an action, or an agreement to
> make a decision or to take action on a specific matter. . . .
> The decision or action must be made on a question or
> matter that involves a formal exercise of governmental
> power.  That means that the question or matter must be
> specific, focused, and concrete.[17]

We turn first to the defendants' general challenge to the "as opportunities arise" theory of bribery.  The "as opportunities arise" theory of bribery requires the government to prove, in the context of Hobbs Act extortion, that a public official received a payment to which he was not entitled and, in return for that payment, "underst[ood] that he or she [was] expected as a result of the payment

---

[16] App. at 6938–39.

[17] *Id.* at 6942–43.

to exercise particular kinds of influence—i.e., on behalf of the payor—as specific opportunities arise."[18]  Put differently, this theory means that the government "does not have to prove an explicit promise to perform a particular act made at the time of payment" so long as the general nature of the act to be taken was understood at the time of the payment.[19]  The validity of this theory of bribery was firmly established by our court prior to *McDonnell*.[20]

In *McDonnell*, the Supreme Court held that "an 'official act' is a decision or action on a 'question, matter, cause, suit, proceeding or controversy'" that "involve[s] a formal exercise of governmental power" and must concern "something specific and focused that is 'pending' or 'may by law be brought' before a public official."[21]  That formulation raised the question of whether the action to be taken in the future by a public official under the "as opportunities

---

[18] *United States v. Coyne*, 4 F.3d 100, 114 (2d Cir. 1993).

[19] *Id.*

[20] *See, e.g., United States v. Bruno*, 661 F.3d 733, 744 (2d Cir. 2011) ("Acts constituting the agreement need not be agreed to in advance.  A promise 'to perform such acts as the opportunities arise' is sufficient." (quoting *United States v. Ganim*, 510 F.3d 134, 142 (2d Cir. 2007))); *Ganim*, 510 F.3d at 142 (holding that "the requisite quid pro quo for [Hobbs Act extortion under 18 U.S.C. § 1951, honest services mail fraud under 18 U.S.C. § 1341, and federal programs bribery under 18 U.S.C. § 666] may be satisfied upon a showing that a government official received a benefit in exchange for his promise to perform official acts or to perform such acts as the opportunities arise").

[21] *McDonnell*, 136 S. Ct. at 2371–72.  As is common in such prosecutions, the definition of "official act" used by the district court for the relevant elements of both Hobbs Act extortion and honest services fraud was the definition set forth in the federal bribery statute, 18 U.S.C. § 201.  "An 'official act' [was] defined as 'any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit.'"  *Id.* at 2365 (quoting 18 U.S.C. § 201(a)(3)).

arise" theory of bribery is compatible with the heightened specificity of "official act" required by *McDonnell*. In *United States v. Silver*, however, we reaffirmed that the "as opportunities arise" theory of bribery survived *McDonnell*.[22] We therefore have no need to dwell further on this portion of the defendants' challenge to the jury instructions.

The second part of the Skeloses' challenge to the jury instructions requires closer examination. Although *Silver* confirmed the ongoing validity of the "as opportunities arise" theory of bribery, it also recognized that faithfulness to *McDonnell* requires some limitation on that theory. In *Silver*, we noted that, although *McDonnell* does not "require[] identification of a particular *act* of influence, . . . it requires identification of a particular *question or matter* to be influenced."[23] Accordingly, we held that a jury must be required to find that, at the time the defendant accepted the relevant payment, he understood he was expected "to take official action on a *specific and focused question or matter* as the opportunities to take such action arose."[24]

The jury instructions in this case failed to require that the "specific and focused question or matter" on which Dean Skelos was expected to take official action be identified at the time of the payment. The instructions required only that Skelos be expected to "perform official acts in exchange for the property." This left open the possibility that the jury could convict even if Skelos was expected to take official action on *any* question or matter in return for the payment. Although the jury was properly instructed that, for an act to qualify as an "official act," it

---

[22] 948 F.3d 538, 552 (2d Cir. 2020).

[23] *Id.* at 552.

[24] *Id.* at 568.

must be taken on a "question or matter [that is] specific, focused, and concrete," the jury was not required to find that Skelos and the bribing party shared a specific enough understanding of the question or matter upon payment. After *Silver*, which was handed down after the district court's judgment, this was error.

We have no difficulty, however, finding the error to be harmless in light of the factual record at trial and therefore decline to vacate the defendants' convictions. "For the erroneous instructions to have been harmless, it must be 'clear beyond a reasonable doubt that a rational jury would have found [the defendant] guilty absent the error.'"[25] The burden lies with the government to establish that error is harmless.[26] Because the guilt or innocence of each defendant must be addressed individually, we turn first to Dean Skelos and then to Adam.

We are convinced beyond a reasonable doubt that a rational jury, if properly instructed, would have found that Dean Skelos entered each quid pro quo arrangement with the understanding that he was expected to "to take official action on a *specific and focused question or matter* as the opportunities to take such action arose."[27] For each scheme, the government proved that Skelos understood he was expected to take actions in furtherance of concrete objectives in return for the unearned payments being provided to Adam. As we observed in *Silver*, and as is the case here, "[c]ircumstantial evidence demonstrating an understanding

---

[25] *Id.* at 569 (quoting *United States v. Bah*, 574 F.3d 106, 114 (2d Cir. 2009)).

[26] *Id.*

[27] *Id.* at 568.

between the payor and the official will often be sufficient for the Government to identify a properly focused and concrete question or matter."[28]

First, for the Glenwood scheme, it is clear that Glenwood personnel expected Skelos to take official action specifically with respect to Section 421-a renewals and related rent regulations, in return for payments to Adam. In a meeting on May 5, 2011, Glenwood personnel told Skelos that 421-a renewal was a priority, and Dorego promised to get Adam a job with AbTech.[29] In a meeting on June 16, 2011, Glenwood personnel again specified that 421-a renewal was a priority.[30] In response, Skelos first asked about the possibility of getting Adam a job at AbTech, but later, upon realizing that the AbTech job was "going to take a long time," asked if Glenwood personnel could "find something for Adam in the meantime."[31] After Skelos ultimately voted to renew 421-a, Adam was given a job at AbTech.[32]

Second, for the AbTech scheme, it is clear that AbTech personnel expected Skelos to take official action specifically with respect to the Nassau County RFP for the storm water project (including promoting legislation supporting AbTech's RFP contract), in return for payments to Adam. Here, there was an email that explicitly linked the legislation to Adam's position at AbTech, in which Dorego noted that if Adam did not get a raise, he did not think Dean Skelos would advance

---

[28] *Id.* at 557.

[29] App. at 4446–49.

[30] *Id.* at 4455.

[31] *Id.*

[32] *Id.* at 4456–57, 4783–84, 4957–60.

the desired legislation.[33]   Subsequently, Adam received a raise from $4,000 to $10,000 per week.[34]  Skelos both pressured the Nassau County Executive to release payments to AbTech pursuant to the contract and voted for legislation authorizing funding for which AbTech was eligible under the contract.[35]

Third, for the PRI scheme, it is clear that PRI personnel expected Skelos to take official action with respect to extenders legislation renewal.  Bonomo testified that the extenders legislation was so "critical" to PRI's business that he brought it up "[a]ny time [he] was in [Skelos's] presence."[36]  Skelos first asked Bonomo to pay Adam just a few months before Dean Skelos voted for the legislation in March 2011.[37]  Bonomo testified that because the extenders legislation was up for renewal over a period of years, and because it was not certain to pass, he felt he had to keep Adam on the payroll even though Adam did virtually no work.[38]

Additionally, the government's theory of the case comported with the specificity required by *Silver*, even if the jury charge was overly broad in retrospect.  The government argued in summation that Dean Skelos understood the payments to Adam were made in exchange for actions taken in these

---

[33] Suppl. App. at 10.

[34] App. at 5004–06.

[35] *Id.* at 7135–36, 4302.

[36] *Id.* at 5568–70.

[37] *Id.* at 5570–71.

[38] *Id.* at 5527–28.

specifically identified matters.[39]   Moreover, the jury convicted on the related gratuity counts after being instructed that "[t]o prove an illegal gratuity, . . . the government must prove that there was a link between a thing of value conferred on Dean Skelos and a specific official act for or because of which he solicited or accepted the payment."[40]   We are therefore left with no doubt that a properly instructed jury would have convicted Dean Skelos on all counts.

Turning next to the son, Adam Skelos argues that the error was not harmless as to him because there was no evidence that he knew his father had promised official action on any specific matter.   At most, Adam contends, he had only general knowledge that his father was to take non-specific official action in exchange for the payments Adam was receiving.[41]  This contention is contradicted by the record, and it is clear beyond a reasonable doubt that a properly instructed jury would have convicted Adam as well.

As to the AbTech scheme, Dorego testified that Adam and his father discussed whether it would be "worth it" for Dean Skelos to push through the legislation if Adam was making less money than his colleagues at the job for which he did no work.   This discussion between father and son clearly indicated that Adam understood Skelos's vote on the RFP legislation was linked to Adam's desired pay raise.[42]

---

[39] *See generally id.* at 6593–6888.

[40] *Id.* at 6979.

[41] Defendant-Appellant Adam Skelos's Post-Arg. Br. at 5.

[42] App. at 4549.

As to the PRI scheme, when Adam went to work at PRI, he introduced himself to his supervisor by saying, "You know who I am, right? I'm Adam Skelos."[43]  Later, when the supervisor asked why Adam barely showed up to work, Adam said that there was an arrangement between Bonomo and Dean Skelos.[44]  In conjunction with both the evidence that Adam and Skelos discussed a variety of legislative issues that came before Skelos as Majority Leader,[45] and the evidence of Adam's thorough understanding of the AbTech scheme, it is beyond a reasonable doubt that Adam also understood the specific nature of his father's "arrangement" with Bonomo.

Similar reasoning prevails as to the Glenwood scheme, in which Adam accepted a $20,000 payment without questioning it or requesting an explanation for it being offered.[46]  Again, viewed in the context of the full record of Adam's involvement in his father's legislative affairs and Adam's actions in the other schemes, it is clear to us that a properly instructed jury would find that Adam understood his father to be taking specific official action in exchange for the payout.

## II.  Validity of the Indictment

In a related challenge, the defendants contest the sufficiency of the indictment, arguing that it "relied on an invalid 'as opportunities arise' theory of

---

[43] *Id.* at 4143.

[44] *Id.* at 4155.

[45] *See, e.g., id.* at 7104–05 (discussing fracking legislation), 7139–40 (discussing P3 legislation).

[46] *Id.* at 4785.

bribery" and that it failed to "allege that [Dean] Skelos agreed, 'at the time' he solicited or accepted payment, that he would take . . . particular . . . actions on any concrete, identified matter."[47]   This challenge is a question of law, reviewed *de novo*.[48]

The challenge fails for two reasons.   First, as discussed above, *Silver* reaffirmed the validity of the "as opportunities arise" theory of bribery.   Second, indictments are not required to do anything more "than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."[49]   This one did.[50]   The language in an indictment is not required to be as precise as the attendant jury charge, nor is it required to delineate how the government will prove the elements set forth in the indictment.

## III.   Venue

The Skeloses argue that the district court's denial of their motion for transfer of venue was reversible error because there was "pervasive, inflammatory, and deeply personal coverage" of their cases in the New York City news media, and because the juror questionnaires "made clear that no fair and impartial jury could be seated in the Southern District of New York."[51]   We review the district court's

---

[47] Defendant-Appellant Dean Skelos's Br. at 32–33.

[48] *United States v. Stringer*, 730 F.3d 120, 123 (2d Cir. 2013).

[49] *Stringer*, 730 F.3d at 124 (quoting *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000)).

[50] App. at 96–105.

[51] Defendant-Appellant Adam Skelos's Br. at 20.

denial of a motion to transfer venue for abuse of discretion,[52] and find none here. The district court empaneled a fair and impartial jury.

A district court "must transfer" proceedings when prejudice to a defendant makes it such that "the defendant cannot obtain a fair and impartial trial" in the district.[53]  In assessing whether that is the case, the district court "may" consider "the extent to which the government is responsible for generating the publicity, the extent to which the publicity focuses on the crime rather than on the individual defendants charged with it, and other factors reflecting on the likely effect of the publicity on the ability of potential jurors in the district to hear the evidence impartially."[54]  The district court may also take into account the size of the venue,[55] and the amount of time that has passed since the bulk of the negative publicity, as "the effects of publicity [can] dissipate[]" before trial.[56]  Ultimately, whether the district court abused its discretion in denying a motion to transfer venue turns not on the venire's "mere exposure to pretrial publicity" but rather on the "actual prejudgment by the venire of the issues to be decided in the case."[57]  These factors do not support the defendants' transfer motion.

News media outlets began reporting that the federal government was investigating Dean Skelos in January 2015.  In April 2015, the New York Times

---

[52] *United States v. Maldonado-Rivera*, 922 F.2d 934, 967 (2d Cir. 1990).

[53] Fed. R. Crim. P. 21(a).

[54] *Maldonado-Rivera*, 922 F.2d at 967.

[55] *See United States v. Dioguardi*, 428 F.2d 1033, 1039 (2d Cir. 1970).

[56] *United States v. Sabhnani*, 599 F.3d 215, 233 (2d Cir. 2010).

[57] *Id.*

reported that federal prosecutors were presenting evidence to a grand jury that was investigating Dean Skelos and his son. Over the next two weeks, other newspapers reported information about the grand jury proceedings. The grand jury ultimately indicted Dean and Adam Skelos in July 2015.

The trial from which the Skeloses now appeal, however, did not take place until July 2018. Three years had elapsed since the bulk of the allegedly problematic negative reporting. Moreover, the Southern District of New York is a densely populated area that includes New York, Bronx, and Westchester counties. The jury selection record shows that more than enough jurors were available for the venire who were either previously unaware of Dean and Adam Skelos or who had no prejudgments about the case.

The defendants complain that 45 of the 127 potential jurors "expressed outward negative feelings . . . towards Republicans, politicians, or the Skeloses,"[58] but it would be impossible to prosecute politicians in almost any district if that fraction of the venire's antipathy towards one of two major political parties (or politicians generally) were sufficient to spoil venue. Ultimately, only two of the jurors mentioned in the defendants' briefing survived voir dire's for-cause stage, and the government used peremptory challenges on both of them.[59]

---

[58] Defendant-Appellant Adam Skelos's Br. at 33.

[59] App. at 1219, 1223.

## IV.    Acceptance of Gratuities

The Skeloses challenge their convictions under 18 U.S.C. § 666,[60] asking us to overturn our precedent in *United States v. Bonito*[61] to find that § 666 does not permit convictions based on acceptance of gratuities.  We do not have the power to do so, acting as a panel of this court.

Moreover, the Skeloses do not challenge these convictions to the extent that they are predicated on bribery, and both bribery and acceptance of gratuities are independent bases for conviction under § 666.[62]  Here, a special verdict form specified that the jury found each defendant guilty under § 666 on both the gratuity theory and the unchallenged bribery theory.[63]  Therefore there is no basis to vacate these convictions.

## V.    Quashed Subpoenas

The defendants challenge the district court's decision to quash certain subpoenas seeking impeachment evidence against Bonomo and Dorego.  They argue that the district court's application of the standard set forth in *United States*

---

[60] 18 U.S.C. § 666 prohibits state officials from:

> [C]orruptly solicit[ing] or demand[ing] for the benefit of any person, or accept[ing] or agree[ing] to accept, anything of value from any person, intended to be influenced or rewarded in connection with any [government business or transactions] involving any thing of value of $5,000 or more.

[61] 57 F.3d 167 (2d Cir. 1995).

[62] *Bonito*, 57 F.3d at 171.

[63] App. at 7034–36.

*v. Nixon*[64] was a violation of both their Fifth and Sixth Amendment rights and the Federal Rules of Criminal Procedure.[65]  We review the district court's decision to quash the subpoenas for abuse of discretion.[66]

The Skeloses tried unsuccessfully to subpoena certain evidence to be used to impeach the credibility of witnesses Bonomo and Dorego.  The first category of evidence that was sought related to Bonomo and consisted of a number of records from PRI, which was concurrently under investigation by the New York Department of Financial Services (DFS).[67]  The request included documents that PRI, Anthony Bonomo, and his brother Carl, PRI's Chief Operating Officer, had produced to DFS, transcripts of depositions conducted by DFS and the exhibits to those depositions, DFS interrogatories and the answers provided to them, and communications between DFS and the government.[68]

The district court quashed these subpoenas as "unreasonable" under Federal Rule of Criminal Procedure 17(c)[69] and *Nixon*.  In order to find that production of documents requested in a subpoena would not be "unreasonable or oppressive" under Rule 17(c), *Nixon* requires:

---

[64] 418 U.S. 683 (1974).

[65] Defendant-Appellant Dean Skelos's Br. at 46.

[66] *In re Irving*, 600 F.2d 1027, 1034 (2d Cir. 1979).

[67] App. at 675.

[68] *United States v. Skelos*, No. 15-CR-317 (KMW), 2018 WL 2254538, at *2 (S.D.N.Y. May 17, 2018).

[69] Rule 17(c)(2) provides, in relevant part, that "the court may quash or modify the subpoena if compliance would be unreasonable or oppressive."

(1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general fishing expedition.[70]

Applying this standard, the court determined that the subpoenas were "not sufficiently specific and request[ed] the production of documents that [were] either not admissible at trial or [were] obtainable through other means."[71] We can find no abuse of discretion in the district court's quashing of the Bonomo/PRI subpoenas for that reason.

The second category of evidence was sought to impeach Dorego. The defendants subpoenaed information from Glenwood and Dorego to demonstrate that Dorego had received unlawful kickbacks, engaged in sham transactions, and made straw campaign contributions.[72] The district court upheld subpoenas related to the alleged kickbacks[73] but quashed those that asked for "documents and communications concerning [Dorego's] purchase of Cleanwater from Steven

---

[70] 418 U.S. at 699–700 (footnote and quotation marks omitted).

[71] *Skelos*, 2018 WL 2254538, at *2.

[72] *Id.* at *5–8.

[73] *Id.* at *6.

Swarzman including any consideration paid for this purchase,"[74] Swarzman's "documents and communications concerning transactions with Charles Dorego, Christopher McKenna, Thomas Dwyer, American Land Abstract or [ALS],"[75] and "documents and communications concerning any contributions (political or otherwise) funded by Glenwood but made in the name of another person or entity."[76] Following *Nixon*, the district court determined that these requests were either fishing expeditions or irrelevant.[77] We find no abuse of discretion in the district court's decision to quash these subpoenas as "unreasonable or oppressive" under Rule 17.

We also see no infringement of the Skeloses' Fifth and Sixth Amendment rights in the district court's denial of requests for documents that were irrelevant, inadmissible, obtainable by other means, or part of discovery fishing expeditions.

## VI.    Denial of an Evidentiary Hearing

Dean and Adam Skelos contend that the district court erred in not holding a hearing to determine if the government violated Federal Rule of Criminal Procedure 6(e), which prohibits "attorney[s] for the government" from disclosing matters occurring before a grand jury.[78] They argue that they made a prima facie case of a Rule 6(e) violation because of newspaper reports about grand jury

---

[74] *Id.*

[75] *Id.* at *8.

[76] *Id.*

[77] *Id.* at *6, *8.

[78] Defendant-Appellant Dean Skelos's Br. at 54.

proceedings that cited "government investigators" as sources.[79]  We review the district court's failure to hold the requested hearing for abuse of discretion.[80]

The district court found that the defendants had not made out a prima facie case of a Rule 6(e) violation, and we agree.  In assessing whether a defendant has established a prima facie violation of Rule 6(e), the district court examines, inter alia, "(1) whether the media reports disclose matters occurring before the grand jury; (2) whether the media report[s] disclose[] the source as one prohibited under Rule 6(e); and (3) evidence presented by the government to rebut allegations of a violation of Rule 6(e)."[81]  Contrary to the defendants' contentions, the media outlets only identified a "government source" or "[l]aw-enforcement sources," not government investigators.[82]  The government in this case affirmed by affidavit that none of the Assistant United States Attorneys, investigators, and FBI agents involved in this investigation spoke to the press.[83]  There was no evidence to the contrary before the district court.  The district court thus had a sound basis for finding no prima facie showing of a Rule 6(e) violation,[84] and accordingly we find no abuse of discretion.

---

[79] *Id.* at 54, 59.

[80] *United States v. Walters*, 910 F.3d 11, 22 (2d Cir. 2018).

[81] *United States v. Rioux*, 97 F.3d 648, 662 (2d Cir. 1996).

[82] *United States v. Skelos*, No. 15-CR-317 (KMW), 2018 WL 2849712, at *7 (S.D.N.Y. June 8, 2018).

[83] *Id.*

[84] *See Rioux*, 97 F.3d at 662 (finding the district court acted within its discretion in finding no prima facie violation where the government had submitted affidavits denying it was the source even though the news article's source was "likely" a government official).

## VII. Adam Skelos's Evidentiary Challenge

Adam Skelos argues that the district court erred in admitting into evidence (1) records and charts showing his annual incomes for the years 2010 through 2014, and (2) a phone call between Adam and Demetrios Raptis, a Greek diner owner who heads an association of Greek diner owners. Adam contends this evidence was irrelevant under Federal Rule of Evidence 401 and, in any event, should have been excluded under Federal Rule of Evidence 403.[85]

We review a district court's evidentiary rulings under "a deferential abuse of discretion standard" and will disturb its rulings "only where the decision to admit or exclude evidence was manifestly erroneous."[86] In the context of Rule 403, we conduct this review recognizing that "[a] district court is, of course, in the best position to do the balancing required."[87] In light of that deferential standard, we can find no abuse of discretion in admitting the evidence here.

First, both challenged pieces of evidence were relevant.[88] Adam's overall income was relevant to proving intent, as the defendants had represented to the victims of their extortion that the payments were needed to help Adam

---

[85] Defendant-Appellant Adam Skelos's Br. at 52–53.

[86] *United States v. Litvak*, 808 F.3d 160, 179 (2d Cir. 2015) (quoting *United States v. McGinn*, 787 F.3d 116, 127 (2d Cir. 2015)).

[87] *United States v. Ansaldi*, 372 F.3d 118, 131 (2d Cir. 2004), *abrogated on other grounds by McFadden v. United States*, 576 U.S. 186 (2015).

[88] Evidence is relevant if it "has *any* tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401 (emphasis added).

financially.[89]  In fact, Adam had a total income of over $1.35 million across five years,[90] and so the false representations made to those paying the bribes tended to reinforce a corrupt intent to extract monetary value from Skelos's public office. The call with Raptis was also relevant to proving intent, as it tended to prove Adam's awareness that his conduct was unlawful.  On the call, Adam referenced his father, offered to use his "reach" to benefit Raptis, and then said he is "not going to say . . . on the phone" how he "could get a lot of things done for [Raptis]."[91]  Both of these pieces of evidence easily surpass the low bar for relevancy.

Second, neither of the challenged pieces of evidence meets the high bar on appeal to reverse the district court's discretionary finding of admissibility under Rule 403, which provides for the exclusion of otherwise relevant evidence if "its probative value is substantially outweighed by a danger of . . . unfair prejudice."[92] Adam contends that the evidence of his income was unfairly prejudicial.[93]  His annual average income, however, was neither grotesque nor central to the trial. As to the Raptis call, Adam contends that his "nasty" and "racially charged" rudeness on the call unfairly prejudiced him.[94]  We do not take issue with Adam's characterization of his behavior on the call, but we do not think the district court

---

[89] App. at 4490–91, 5588, 7047.

[90] *Id.* at 7345–46.

[91] *Id.* at 7120.4–20.7.

[92] Fed. R. Evid. 403.

[93] Defendant-Appellant Adam Skelos's Br. at 53.

[94] *Id.* at 57.

abused its discretion in concluding that the evidence was not unfairly prejudicial in light of its considerable probative value regarding Adam's intent. Accordingly, we see no reason to disturb the district court's discretionary assessment that this evidence ought not be excluded pursuant to Rule 403.

## VIII.  Adam Skelos's Sufficiency Challenge

Adam Skelos challenges the sufficiency of the evidence for his convictions on the PRI and Glenwood schemes.[95] In addressing this challenge, we view the evidence in the light most favorable to the government and will affirm if any rational trier of fact could have convicted the defendant beyond a reasonable doubt.[96]

For the reasons we discussed above regarding the harmlessness of the instructional error—a context in which the standard of review is more favorable to Adam—we find that the evidence was sufficient to support Adam's convictions. Moreover, the jury could reasonably infer Adam's culpable intent from his willingness to rip up checks at Bonomo's request after the government's investigation in this case had commenced.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgments of conviction in full.

---

[95] *Id.* at 41.

[96] *Silver*, 864 F.3d at 113.