*18-2990 (L)*
*United States v. Percoco*

# United States Court of Appeals
# For the Second Circuit

August Term 2019

Argued:  March 12, 2020
Decided:  September 8, 2021

Nos. 18-2990, 18-3710, 19-1272

UNITED STATES OF AMERICA,
*Appellee*,

*v.*

JOSEPH PERCOCO, STEVEN AIELLO, JOSEPH GERARDI,
LOUIS CIMINELLI, ALAIN KALOYEROS, AKA DR. K,

*Defendants-Appellants*,

PETER GALBRAITH KELLY, JR.,
MICHAEL LAIPPLE, KEVIN SHULER,
*Defendants*.*

Appeal from the United States District Court
for the Southern District of New York
No. 16-cr-776, Valerie E. Caproni, *Judge*.

---

* The Clerk of Court is respectfully directed to amend the case caption to conform with the caption above.

Before: RAGGI, CHIN, AND SULLIVAN, *Circuit Judges*.

Defendants-Appellants Joseph Percoco and Steven Aiello appeal from judgments of conviction entered in the United States District Court for the Southern District of New York (Caproni, *J.*), after a jury found Aiello guilty of one count of conspiracy to commit honest-services wire fraud and found Percoco guilty of two counts of conspiracy to commit honest-services wire fraud, as well as one count of solicitation of bribes and gratuities. On appeal, the defendants principally challenge the district court's instruction that (1) the jury could convict them of conspiracy to commit honest-services fraud based on Percoco accepting payment to take official action to benefit the briber "as opportunities arise" and (2) the defendants could be liable for conspiracy to commit honest-services fraud for actions that Percoco agreed to undertake while he was not formally employed as a state official. Although the as-opportunities-arise instruction fell short of our recently clarified standard, which requires that the honest-services fraud involve a commitment to take official action on a particular matter or question, that error was harmless. The second contested instruction was not error at all. In so concluding, we reaffirm our decades-old decision holding that a person who is not technically employed by the government may nevertheless owe a fiduciary duty to the public if he dominates and controls governmental business, and is actually relied on by people in the government because of some special relationship. Finding no merit in the other arguments raised on appeal, we **AFFIRM** the judgment of the district court.

Matthew D. Podolsky (Robert L. Boone, Janis M. Echenberg, Won S. Shin, *on the brief*), Assistant United States Attorneys, *for* Audrey Strauss, United States Attorney for the Southern District of New York, New York, NY, *for Appellee* United States of America.

Michael L. Yaeger, Carlton Fields, P.A., New York, NY (Walter P. Loughlin, New York, NY, *on the brief*), *for Defendant-Appellant* Joseph Percoco.

Alexandra A.E. Shapiro (Daniel J. O'Neill, and Fabien Thayamballi, *on the brief*), Shapiro Arato Bach LLP, New York, NY *for Defendant-Appellant* Steven Aiello.

RICHARD J. SULLIVAN, CIRCUIT JUDGE:

This case, which concerns public corruption in New York State, requires us to again consider the reach of the federal fraud and bribery statutes. Defendants-Appellants Joseph Percoco and Steven Aiello appeal from judgments of conviction entered in the United States District Court for the Southern District of New York (Caproni, *J.*), after a jury found Aiello guilty of conspiracy to commit honest-services wire fraud, in violation of 18 U.S.C. § 1349, and found Percoco guilty of both conspiracy to commit honest-services wire fraud, in violation of 18 U.S.C. § 1349, and solicitation of bribes or gratuities, in violation of 18 U.S.C. §§ 666(a)(1)(B) and 2.[1]

On appeal, the defendants argue that the district court committed reversible error when it (1) instructed the jury that it could convict defendants of conspiracy to commit honest-services fraud based on Percoco accepting payment to take official action to benefit the briber "as opportunities ar[i]se"; (2) charged the jury that the defendants could be liable for conspiracy to commit honest-services fraud

[1] The district court held a second trial on separate, fraud-related counts in which Aiello, Alain Kaloyeros, Joseph Gerardi, and Louis Ciminelli were convicted on several conspiracy and substantive wire fraud counts, and Gerardi was convicted on a false statement count. Although the cases were consolidated upon appeal, the fraud trial is addressed in a separate opinion in *United States v. Aiello*, Nos. 18-3710-cr, 18-3712-cr, 18-3715-cr, and 18-3850-cr.

for actions Percoco took while he was not formally employed as a state official; (3) instructed the jury that Percoco could be liable under § 666 for soliciting, demanding, accepting, or agreeing to accept a gratuity as a reward for certain action; (4) constructively amended Aiello's indictment by permitting his conviction to be based on acts Percoco committed while he was not a public official; (5) denied defendants' motions for a judgment of acquittal based on the insufficiency of the evidence at trial; and (6) ordered forfeiture against Percoco in the amount of $320,000. Finding none of these arguments persuasive, we **AFFIRM**.

## I. BACKGROUND

### A. Facts

This case involves two schemes in which Percoco – a longtime friend and top aide to former Governor Andrew Cuomo – accepted payment in exchange for promising to use his position to perform official actions. For the first scheme, Percoco promised to further the interests of an energy company named Competitive Power Venture ("CPV"). For the second, Percoco agreed with Aiello to advance the interests of Aiello's real estate development company, COR Development Company. Drawing from the evidence introduced at trial, we

4

briefly describe the facts of these schemes in the light most favorable to the government. *See United States v. Silver*, 948 F.3d 538, 546 n.1 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 656 (2021).

### 1.    The CPV Scheme

The CPV scheme started in 2012, when Percoco served as a high-level official in the Governor's Office, also called the Executive Chamber.  For all his political influence, Percoco found himself financially constrained.  So he reached out to his friend Todd Howe, who was an influential and corrupt lobbyist.  Percoco confided in Howe that money was tight, and he asked if any of Howe's clients would hire Percoco's wife.  Sometime later, Howe approached Peter Galbraith Kelly, Jr., whose energy company, CPV, was angling for a so-called "Power Purchase Agreement" that would have required New York State to purchase power from CPV.

Percoco, Howe, and Kelly met over dinner to discuss an arrangement whereby Percoco would help CPV secure the Power Purchase Agreement in exchange for securing employment for – and sending payments to – Percoco's wife.  Throughout the fall of 2012, Percoco pressured Howe to close the deal with Kelly so that Percoco could earn what he and Howe code-named "ziti" – a

5

reference to the term for payoffs featured in the mafia-themed television show "The Sopranos." *See* Suppl. App'x at 1–3; App'x at 553. CPV later hired Percoco's wife as an "education consultant" paying her $7,500 a month for a few hours of work each week. To conceal this arrangement, Kelly instructed his employees to omit the last name of Percoco's wife from CPV materials, and routed the payments through a third-party contractor, whom Percoco referred to as Kelly's "money guy." Suppl. App'x at 212. Invoices from Kelly's "money guy" likewise excluded any reference to Percoco's wife.

In exchange for these payments, Percoco agreed to help CPV obtain a Power Purchase Agreement from New York State. Later, while serving as Executive Deputy Secretary in Cuomo's administration, Percoco confirmed in an email that he would "push on" the supervisor of New York's state agencies, Howard Glaser, to discourage the state from awarding a Power Purchase Agreement to one of CPV's competitors. Howe replied that Percoco had to "[h]old [Glaser's] feet to the fire" to "keep the ziti flowing." *Id.* at 30.

Percoco also accepted continued payments to influence New York State officials to approve a so-called "Reciprocity Agreement" between New York and New Jersey, which was designed to allow CPV to build a power plant in New

6

Jersey by purchasing relatively inexpensive emission credits in New York. After an assistant commissioner in New York's Department of Environmental Conservation ("DEC") told Kelly that he would need a "push from above" to secure the agreement, *id.* at 8–10, Kelly, through Howe, reached out to Percoco for that push. In response, Percoco stated that he would contact the Commissioner of the DEC. When Howe followed up with Percoco about a week later, Percoco indicated that his mother was not well, and referred Howe to Glaser and another high-ranking official in Governor Cuomo's administration who could contact the DEC Commissioner. Copying Percoco on the email, Howe forwarded the message to Glaser and the other official. Glaser and the other official then successfully directed the Commissioner to have the state agency enter into the Reciprocity Agreement with New Jersey.

### 2. The COR Development Scheme

The second scheme began while Percoco was temporarily managing Governor Cuomo's reelection campaign in 2014. Pursuant to this scheme, Aiello arranged for his company, COR Development, to pay Percoco to take action to benefit the company. Initially, Aiello sought out Percoco's assistance so that COR Development could avoid entering into a potentially costly agreement with a local

union, known as a "Labor Peace Agreement," prior to receiving state funding for a project. On July 30, 2014, Aiello emailed Howe asking whether "there is any way Joe P can help us" with the Labor Peace Agreement "while he is off the 2nd floor working on the Campaign." App'x at 680. The next day, Aiello followed up with an email to Howe asking him to "call Joe P." for "help" on the Labor Peace Agreement. Suppl. App'x at 59. Less than two weeks later, COR Development transferred $15,000 to an entity that Howe controlled, prompting Howe to cut a $15,000 check to Percoco's wife. In October 2014, after several emails were exchanged but before Percoco had taken any action concerning the Labor Peace Agreement, COR Development sent an additional $20,000 to Percoco through the same circuitous route. Percoco received both payments after he had told his bank and several others that he intended to return to the Governor's Office.

After receiving payment, Percoco directed a state agency, Empire State Development ("ESD"), to reverse its previous decision requiring COR Development to enter into a Labor Peace Agreement. On December 3, 2014, Howe forwarded Percoco an email from Aiello's partner, Joseph Gerardi, pressing Howe to have Percoco resolve the issue. Percoco responded that Howe should stand by;

8

within an hour, Percoco called Andrew Kennedy, who oversaw ESD, and urged him to move forward without the Labor Peace Agreement.

At that point, Percoco was a few days from formally returning to his position in the Governor's Office and had already signed and submitted his reinstatement forms. In fact, Percoco's swipe-card and telephone records revealed that he was at his desk in the Executive Chamber when he directed Kennedy to resolve the Labor Peace Agreement in COR Development's favor. Kennedy testified that he interpreted Percoco's call as "pressure" coming from one of his "principals," who was a "senior staff member[]," and that he relayed this sentiment to another senior executive at the agency when encouraging that official to waive the required Labor Peace Agreement. App'x at 535. After his call with Kennedy, Percoco contacted Howe to confirm that the state agency would soon reach out to Gerardi "with a different perspective" on the need for a Labor Peace Agreement. *Id.* at 710 (internal quotation marks omitted). The following morning, the agency did as Percoco predicted.

After he resumed his official role in Governor Cuomo's administration, Percoco pressured subordinate state officials to prioritize and release outstanding funds that the state owed COR Development. Percoco also ordered the Director

of Administrative Services for the Executive Chamber and employees of the Office of General Services to process a stalled pay raise for Aiello's son, who at that time worked in the Executive Chamber. Recognizing Percoco's role in procuring a raise for his son, Howe encouraged Aiello to send Percoco a thank-you note.

## B. Procedural History

The federal government eventually caught wind of the schemes, and in November 2016, a grand jury indicted Percoco, Aeillo, Kelly, and Gerardi for their alleged roles in them. The operative indictment, a second superseding indictment filed in September 2017, charged eighteen counts, eleven of which concern the CPV and COR Development schemes relevant to this appeal. Count Six charged Percoco with conspiracy to commit extortion in connection with both schemes, in violation of 18 U.S.C. § 1951. Counts Seven and Eight charged Percoco with Hobbs Act extortion in connection with the CPV scheme and the COR Development scheme, in violation of 18 U.S.C. §§ 1951 and 2. Count Nine charged Percoco and Kelly with conspiracy to commit honest-services wire fraud during the CPV scheme, in violation of 18 U.S.C. § 1349. Count Ten charged Percoco, Aiello, and Gerardi with conspiracy to commit honest-services wire fraud tied to the COR Development scheme, in violation of 18 U.S.C. § 1349. Counts Eleven and Twelve

10

charged Percoco with solicitation of bribes and gratuities for his efforts in the CPV scheme and the COR Development scheme, respectively, in violation of 18 U.S.C. §§ 666(a)(1)(B) and 2. Count Thirteen charged Kelly with payment of bribes and gratuities as part of the CPV scheme, in violation of 18 U.S.C. §§ 666(a)(2) and 2, while Count Fourteen charged Aiello and Gerardi with violating the same law by paying bribes and gratuities for the COR Development scheme. Finally, Counts Seventeen and Eighteen charged that Aiello and Gerardi, respectively, violated 18 U.S.C. § 1001(a)(2) by making false statements to federal officers during the investigation into the COR Development scheme.

Percoco, Aiello, Gerardi, and Kelly proceeded to a jury trial, which lasted from January 22, 2018 until March 13, 2018. After the government rested, the trial defendants each moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. The district court reserved decision, ultimately denying the motions in an opinion issued after trial. Prior to charging the jury, however, the district court dismissed the Count Eight extortion charge, reasoning in a later-issued opinion that, as a matter of law, Percoco could not have committed Hobbs Act extortion under color of official right, because he did not

11

have an official position in the administration when he received bribe payments tied to the COR Development scheme.

After dismissing the extortion count, the district court instructed the jury. In relevant part, the court stated that to convict the defendants of conspiracy to commit honest-services wire fraud (Counts Nine and Ten) and soliciting or accepting a bribe (Count Eleven), the jury was required to find the existence of a quid pro quo, meaning that a payment was made or solicited or accepted with the intent that "the payment or benefit . . . be in exchange for official actions." App'x at 655–57; *see also id.* at 652–53. Though the court instructed that "[a]n official act or official action is a decision or action on a specific matter that may be pending or may by law be brought before a public official," the court also stated that the quid-pro-quo element would be satisfied if Percoco wrongfully "obtained . . . property . . . in exchange [for] official acts as the opportunities arose." *Id.* at 652–53.

In addition, the district court instructed the jury about Percoco's fiduciary duty for the purposes of Counts Nine and Ten, stating that "[a] person does not need to have a formal employment relationship with the state in order to owe a duty of . . . honest services to the public." *Id.* at 655. According to the district court's instruction, the jury could find that Percoco "owed the public a duty of

12

honest services when he was not a state employee if" (1) "he dominated and controlled any governmental business" and (2) "people working in the government actually relied on him because of a special relationship he had with the government." *Id.* at 655.

The jury ultimately found Percoco and Aiello guilty of conspiracy to commit honest-services wire fraud linked to the COR Development scheme (Count Ten). The jury also returned a guilty verdict against Percoco for conspiring to commit wire fraud related to the CPV scheme (Count Nine) and for soliciting bribes or gratuities during the CPV scheme (Count Eleven). The jury acquitted Percoco, Aiello, and Gerardi on the remaining counts, and deadlocked on the charges against Kelly, who later pleaded guilty to one count of conspiracy to commit wire fraud in connection with the CPV scheme.

The district court sentenced Percoco to a term of 72 months' imprisonment, to be followed by three years' supervised release; imposed a $300 mandatory special assessment; and ordered Percoco to forfeit funds in an amount later determined to be $320,000. The district court sentenced Aiello, who was also convicted on all relevant counts during a separate trial for fraud, to a term of 36 months' imprisonment, to be followed by two years' supervised release; imposed

a $500,000 fine, along with a $300 mandatory special assessment; and ordered

Aiello to forfeit funds in an amount later determined to be $898,954.20.

Percoco and Aiello timely appealed. They now challenge three of the

district court's jury instructions, along with the sufficiency of the evidence

supporting their convictions; assert that the government improperly amended the

indictment by relying on acts Percoco committed when he was not a public official;

and contend that the district court erred when it ordered Percoco to forfeit

$320,000.

## II.    STANDARD OF REVIEW

We review de novo challenges to the district court's jury instructions, as well

as claims of constructive amendment to, or prejudicial variance from, the

indictment. *United States v. Roy*, 783 F.3d 418, 420 (2d Cir. 2015); *United States v.*

*Dove*, 884 F.3d 138, 146, 149 (2d Cir. 2018). We also review de novo the sufficiency

of the evidence, *United States v. Sabhnani*, 599 F.3d 215, 241 (2d Cir. 2010),

recognizing, of course, that a defendant raising such a challenge "bears a heavy

burden because a reviewing court must consider the evidence 'in the light most

favorable to the prosecution' and uphold the conviction if '*any* rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt,'"

14

*United States v. Aguilar*, 585 F.3d 652, 656 (2d Cir. 2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see also United States v. Harvey*, 746 F.3d 87, 89 (2d Cir. 2014). Finally, when a defendant objects to his forfeiture order in the district court, we review the district court's finding of facts with respect to forfeiture for clear error and its legal conclusions de novo. *See Sabhnani*, 599 F.3d at 261.

## III. DISCUSSION

### A. The "As Opportunities Arise" Jury Instruction

The defendants first argue that the district court committed reversible error by instructing the jury that it could convict the defendants of conspiracy to commit honest-services fraud if Percoco had accepted a bribe to take official actions to benefit the payors "as opportunities arose." The government concedes that, in light of the Second Circuit's intervening decision in *United States v. Silver*, the district court's bribery instructions were erroneous; it contends, however, that the error here was harmless. We agree with the parties that the district court's instruction falls short of the legal standard as clarified by *Silver*, but conclude that the error was harmless.

## 1. The "As Opportunities Arise" Instructions Were Erroneous.

Federal law criminalizes the use of wire communications to effectuate a "scheme or artifice to defraud." 18 U.S.C. § 1343. Among the frauds covered by the wire fraud statute are schemes "to deprive another of the intangible right of honest services." *Id.* § 1346. When a public official commits "honest services" fraud, he may be held liable on the "theory that a public official acts as trustee for the citizens and the State and thus owes the normal fiduciary duties of a trustee, e.g., honesty and loyalty to them." *See Silver*, 948 F.3d at 551 (quoting *United States v. Silvano*, 812 F.2d 754, 759 (1st Cir. 1987)). Honest-services fraud is carefully circumscribed, however, and only criminalizes bribes and kickbacks. *Skilling v. United States*, 561 U.S. 358, 409 (2010).

Here, the parties stipulated before the district court that "bribery" for the purposes of the honest-services fraud statute is defined by reference to 18 U.S.C. § 201, which makes it a crime for "a public official" to "corruptly demand[], seek[], receive[], accept[], or agree[] to receive or accept anything of value . . . in return for . . . being influenced in the performance of any official act." 18 U.S.C. § 201(b)(2)(A); s*ee United States v. Percoco*, No. 16-cr-776 (VEC), 2019 WL 493962, at *5 n.12 (S.D.N.Y. Feb. 8, 2019) (noting parties' agreement to charge jury that the

16

"official act" requirement applies); *accord McDonnell v. United States*, 136 S. Ct. 2355, 2365 (2016) ("The parties agreed that they would define honest services fraud with reference to the federal bribery statute, 18 U.S.C. § 201."). To prove bribery under § 201, the government must establish a quid pro quo, proving that Percoco "committed (or agreed to commit) an 'official act' in exchange for" some benefit. *McDonnell*, 136 S. Ct. at 2361.

Although our Court in *United States v. Ganim* held that that the government can satisfy the quid pro quo requirement merely by showing that a government official promised to act for the bribing party's benefit "as the opportunities arise," 510 F.3d 134, 142 (2d Cir. 2007), we recently clarified the limits of this theory in light of the Supreme Court's decision in *McDonnell v. United States*. *See generally Silver*, 948 F.3d at 550–58; *United States v. Skelos*, 988 F.3d 645, 655–56 (2d Cir. 2021). In *McDonnell*, the Supreme Court considered the meaning of the phrase "official act" for the purposes of 18 U.S.C. § 201, and determined that the term referred to "something specific and focused that is 'pending' or 'may by law be brought before any public official.'" 136 S. Ct. at 2374 (quoting 18 U.S.C. § 201(a)(3)). It further held that an official act must be "something that is relatively circumscribed

17

– the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete." *Id.* at 2369.

In *Silver*, we considered the impact of *McDonnell* on the "as opportunities arise" theory of honest-services fraud. As an initial matter, we rejected the argument that *McDonnell* "eliminated" this theory of bribery. *Silver*, 948 F.3d at 552. But while we held that *McDonnell* does not "require[] identification of a particular *act* of influence," we also concluded that *McDonnell* does "require[] identification of a particular *question or matter* to be influenced." *Id.* That is to say, the promisor must at least commit "to take official action *on a particular question or matter* as the opportunity to influence that same question or matter arises." *Id.* at 552–53. So the offered "quo" must have "enough definition and focus to be properly understood as promising, in return for some quid, the formal exercise of governmental power." *Id.* at 557–58.

Applying this standard in *Silver*, we found that the district court improperly instructed the jury that the defendants need only have "expected to exercise official influence or take official action *for the benefit of the payor*." *Id.* at 568. That "open-ended" charge "failed to convey that [the defendant] could not be convicted of honest services fraud unless the [g]overnment proved that, at the time the bribe

18

was accepted, [he] promised to take official action on a *specific and focused question or matter* as the opportunities to take such action arose." *Id.* at 569. We reached the same conclusion in *United States v. Skelos*, which applied *Silver* to a jury instruction predicating liability on the defendant's agreement to "perform official acts in exchange for . . . property." 988 F.3d at 656. That instruction likewise impermissibly "left open the possibility that the jury could convict even if [the defendant] was expected to take official action on *any* question or matter in return for the payment." *Id.*

The district court here instructed the jury that the quid-pro-quo element was satisfied if "Percoco obtained . . . property to which he was not entitled by his public office, knowing that it was given in exchange [for] official acts as the opportunities arose." App'x at 653. As in *Silver* and *Skelos*, which were decided after conclusion of the trial in this matter, the jury instruction here was "too open-ended" because it failed to convey that the defendants could not be convicted of honest-services fraud unless they promised to undertake official action on a specific question or matter as the opportunities arose. *Silver*, 948 F.3d at 569; *see also Skelos*, 988 F.3d at 656.[2]

---

[2] Percoco contends that the "as opportunities arise" error "infected the instructions for every count of conviction in Percoco's case, including § 666," because "[a]ll counts and their instructions

19

## 2. The Erroneous Bribery Instructions Were Harmless.

But the mere fact that the district court's jury charge was erroneous does not end the inquiry. Having found the bribery instructions deficient, we must now consider whether that error is harmless. It is well-settled that "we will not reverse a conviction if the government can show harmlessness, *i.e.*, show that it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *United States v. Ng Lap Seng*, 934 F.3d 110, 129 (2d Cir. 2019) (internal quotation marks omitted); *see also* Fed. R. Crim. P. 52(a). To conclude that the faulty jury instructions were harmless, "we must be convinced that a rational jury would have found that [the defendants] entered into the alleged quid pro quos understanding that [Percoco] was expected to influence 'specific,' 'focused, and concrete' questions or matters." *Silver*, 948 F.3d at 569; *see also United States v. Bah*, 574 F.3d 106, 114 (2d Cir. 2009). Of course, "[c]ircumstantial evidence demonstrating an understanding between the payor and the official will often be sufficient for the [g]overnment to identify a properly focused and concrete

___

alleged Percoco agreed to take 'official action' 'as opportunities arose.'" Percoco Suppl. Br. at 1. But as we have repeatedly explained, "*McDonnell*'s 'official act' standard for the quo component of bribery as proscribed by § 201 does not apply to the 'more expansive' language of § 666." *United States v. Ng Lap Seng*, 934 F.3d 110, 133 (2d Cir. 2019) (quoting *United States v. Boyland*, 862 F.3d 279, 291 (2d Cir. 2017)), *cert. denied*, 141 S. Ct. 161 (2020). Accordingly, Percoco's passing commentary about his § 666 conviction misses the mark.

20

question or matter." *Skelos*, 988 F.3d at 656–57 (first alteration in original) (quoting *Silver*, 948 F.3d at 557). We first address Percoco's conviction for conspiracy to commit honest-services fraud related to the CPV scheme (Count Nine), before turning to both defendants' conviction for conspiracy to commit honest-services fraud connected to the COR Development scheme (Count Ten).

### a. The CPV Scheme

The evidence presented at trial overwhelmingly showed that, from the beginning of the CPV scheme, Percoco and his co-conspirators understood that the payments made to Percoco's wife were in exchange for action on the Power Purchase Agreement. Recall that Percoco approached Howe because he needed an influx of cash, and Howe, playing the role of matchmaker, connected Percoco to Kelly because CPV needed assistance to secure the Power Purchase Agreement. Howe testified that the plan was solidified during a 2012 dinner in Danbury, Connecticut – and even Percoco concedes that the Power Purchase Agreement was discussed over dinner. The evidence further reflects that Percoco pressured Howe to seal the deal with Kelly so that Percoco could get his "ziti." And only after CPV began paying Percoco's wife for her low-show job did Percoco exert his influence to secure the Power Purchase Agreement for CPV. *See United States v. Biaggi*, 909

21

F.2d 662, 684 (2d Cir. 1990) ("[E]vidence of the receipt of benefits followed by favorable treatment may suffice to establish circumstantially that the benefits were received for the purpose of being influenced in the future performance of official duties, thereby satisfying the quid pro quo element of bribery."). Howe's testimony, the email evidence, and the timing of the payments expel any doubt: From the get-go, Percoco agreed to act on the Power Purchase Agreement – a "specific" and "focused" matter as required by *McDonnell* and *Silver*.

We also consider the other specific matter involved in the CPV scheme – the Reciprocity Agreement. The government's theory at trial was that, in exchange for continued monthly payments for his wife's low-show job, Percoco agreed to undertake official action on the Reciprocity Agreement – all to keep the "ziti" flowing. Percoco contends that the Reciprocity Agreement cannot be the basis for his Count Nine conviction, because the jury could at most find that he promised to act on the Reciprocity Agreement a year *after* the CPV conspiracy was hatched. But our caselaw does not support this argument.

As far as timing goes, our caselaw requires that "a particular question or matter must be identified at the time the official makes a promise or accepts a payment." *Silver*, 948 F.3d at 558 (emphasis omitted). This rule hardly precludes

a conviction based on an official's follow-on agreements – after an initial deal is reached – to take additional action in exchange for additional money. It would be strange indeed to hold that an original deal between an official and payor somehow froze their agreement in time, excluding the possibility that an official could later commit to take more acts in order to maintain a revenue stream. Rather, it is enough that the parties identified the "particular question or matter . . . at the time" that they agreed to the official action that would be taken in exchange for additional money. *See id.*

Nothing in *Silver* is to the contrary. In fact, *Silver* explicitly limited its holding to the "'as the opportunities arise' theory as set forth in *Ganim*." *Id.* at 553 n.7. There, we were presented with an unfettered "as opportunities arise" theory, which would have permitted a conviction based on a promise "to take – as the opportunities arise – '*any* decision or action on any question, matter, cause, suit, proceeding or controversy [that] may at any time be pending.'" *Id.* at 556 (alteration in original) (quoting 18 U.S.C. § 201(a)(3)). In *Silver*, we recognized that such a promise was "so vague as to be meaningless," leaving the illusory agreement without any definable quo. *Id.* at 556–57.

Here, the evidence demonstrated a clear quid pro quo on a new, specific matter for additional money in the form of continued monthly payments. While payments were ongoing, Kelly informed Percoco (through Howe) that he needed a "push from above" to secure the Reciprocity Agreement. Suppl. App'x at 4–7. Percoco, in turn, instructed Howe to ask other officials for help; Howe forwarded Percoco's message, copying Percoco, which prompted the state officials who received the email to approve the Reciprocity Agreement. All of this was done to keep the "ziti" flowing. This evidence, combined with the surreptitious method of paying Percoco, strongly supports a finding of guilt – especially because the jury instructions explained that payments to cultivate goodwill were insufficient to establish a quid pro quo. *See Silver*, 948 F.3d at 571.

We therefore have no reasonable doubt that a properly instructed jury would necessarily have found Percoco guilty of the CPV honest-services fraud scheme, and we affirm his conviction on Count Nine. *See Ng Lap Seng*, 934 F.3d at 129.

### b.    The COR Development Scheme

We also find that the erroneous jury instruction was harmless with respect to the charges related to the COR Development scheme, as there can be no doubt

24

that both Aiello and Percoco understood that the payments to Percoco were made to procure his assistance in pressuring ESD to reverse its position on the need for a Labor Peace Agreement.

For starters, neither defendant contested the fact that Aiello sought – and Percoco gave – assistance on the Labor Peace Agreement, which was undoubtedly a specific matter. Percoco, who on appeal primarily piggybacks on Aiello's harmlessness analysis as it relates to the COR Development scheme, effectively conceded in summation that COR Development paid him to advance the company's interests with respect to the Labor Peace Agreement. Tr. at 6354 ("Less than three weeks after COR made its first payment to Joe [Percoco], he was asked to take action, action related to [a Labor Peace Agreement], in fact."). His theory, instead, was that he never agreed to undertake *official* action, in part because he committed to lobby for COR Development while he was on the campaign trail. Though we assess and reject this argument below, the key point here is that the "concreteness" of the question or matter awaiting action was not in doubt.

Indeed, Aiello did not dispute the concreteness of the matter. Instead, Aiello's theory at trial was that he in fact *refused* to pay Percoco and merely sought Howe's help as a consultant. *See id.* at 6084 (arguing during summation that "Steve

25

[Aiello] says, I'm not hiring Percoco. . . . I am paying you [(Howe)] $14,000 a month. . . . You've been telling me for six years, and you've proven it, you've got contacts with the state. Why do I need [Percoco]? No. Gerardi and I talked, we're not hiring him."); *see also id.* at 6087 ("There is no reason why Steve Aiello on his own could have given the money to Joe Percoco."). Aiello argued that Howe, when facing pressure from Percoco about securing a consulting job, transferred funds he received from COR Development without Aiello's knowledge. *See id.* at 6093 (arguing during summation that "[Howe] tells Joe Percoco that the [money] comes from COR, and he lies to him. . . . It comes from checks that he steals from COR . . . ."). But in convicting Aiello and Percoco of honest-services fraud, the jury necessarily rejected Aiello's denials by finding a quid pro quo between him and Percoco. *See United States v. Jennings*, 160 F.3d 1006, 1022 (4th Cir. 1998) (concluding, on plain error review, that the failure to provide a quid pro quo instruction at trial was not reversible error because the defendant "testified that he did not pay [the official] a dime, and [the defendant's] lawyer pressed this point at length in his closing," which the "jury completely rejected" in finding him guilty).

In addition, the evidence overwhelmingly established that Percoco's action on the Labor Peace Agreement was part of the quid pro quo. Howe testified that he encouraged Aiello to hire Percoco because Aiello had been struggling to avoid the Labor Peace Agreement requirement, Aiello agreed to pay Percoco through Howe's firm, and Aiello "wanted that [L]abor [P]eace [A]greement to go away and realized that Joe [Percoco] was in a position that . . . could make that happen, and that's what they were asking" when they agreed to hire him. App'x at 552. Additional evidence introduced at trial corroborated this account. For example, Aiello emailed Howe about the Labor Peace Agreement, asking if there "is there any way Joe P can help us with this issue while he is off the 2nd floor working on the Campaign. We can't seem to put it behind us. . . . I could really use a[n] advocate with regard to labor issues over the next few months." *Id.* at 680. Moreover, Howe's invoices and the memo line in one of the Percoco's paychecks referenced the labor assistance, expressly linking the payment with the official action on a specific matter.

In light of this clear evidence and the fact that the defendants did not contest the specificity or the concreteness of the Labor Peace Agreement, we have no doubt that the jury would have reached the same conclusion on that issue

27

notwithstanding the pre-*Silver* instructional error. *See Neder v. United States*, 527 U.S. 1, 17 (1999) ("[W]here a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless."). And because the evidence of an agreement on the Labor Peace Agreement is so overwhelming, we need not address the other official acts identified by the government in connection with the COR Development scheme – namely, the pay raise for Aiello's son or the release of state funds to COR Development. *See United States v. Eldridge*, 2 F.4th 27, 42 (2d Cir. 2021) ("In light of the overwhelming evidence of [the defendant's] guilt and the jury's verdicts on other counts, there can be no doubt that the jury still would have returned a guilty verdict . . . even if the only theory presented had been" a valid predicate for conviction.).[3]

---

[3] Aiello nevertheless argues that the jury might have convicted him for his efforts to influence his son's pay raise as the jury acquitted Gerardi, who had nothing to do with the salary bump. But our precedent has cautioned against guessing why a jury delivered differing verdicts for co-defendants. *See United States v. Acosta*, 17 F.3d 538, 545 (2d Cir. 1994). It is enough that a reasonable jury would have found that Aiello, as Howe put it, "agreed to hire Joe [Percoco] as a consultant, and the foremost and front and center issue was th[e] [L]abor [P]eace [A]greement." App'x at 567.

## B.     The Fiduciary-Duty Jury Instruction

The defendants also argue that the district court erred when it instructed the jury that the defendants could be guilty of honest-services fraud based on actions Percoco took in 2014, after he resigned from state government to manage Governor Cuomo's reelection campaign. Specifically, the district court charged the jury that Percoco did "not need to have a formal employment relationship with the state in order to owe a duty of . . . honest services to the public," so long as he "owed the public a fiduciary duty." App'x at 655. According to the district court's further instruction, Percoco owed a fiduciary duty to the public if, and only if, (1) "he dominated and controlled any governmental business," and (2) "people working in the government actually relied on him because of a special relationship he had with the government." *Id.* The court also explained that both factors were required, and that "[m]ere influence and participation in the processes of government standing alone are not enough to impose a fiduciary duty." *Id.*

The district court's fiduciary-duty instruction fits comfortably within our decision in *United States v. Margiotta*, where we held that "a formal employment relationship, that is, public office," is not a "rigid prerequisite to a finding of fiduciary duty in the public sector." 688 F.2d 108, 122 (2d Cir. 1982). Rather, a

29

private citizen's "dominance in municipal government" may "give[] rise to certain minimum duties to the general citizenry." *Id.* at 124. Indeed, "[i]t requires little imaginative leap to conclude that individuals who in reality or effect are the government owe a fiduciary duty to the citizenry," just as much as those who are formally employed by a government. *Id.* To spell out the bounds of this fiduciary duty, we looked to common law generally and New York law specifically, ultimately concluding that "the concepts of reliance, and de facto control and dominance" lie "at the heart of the fiduciary relationship." *Id.* at 125.

Although the defendants seem to agree that the district court's fiduciary-duty instruct falls within *Margiotta*, they nonetheless urge us to revisit *Margiotta* and to chart a new course in light of the Supreme Court's decisions in *McDonnell* and *McNally v. United States*, 483 U.S. 350 (1987), as well as various constitutional considerations. We decline to follow that path, and reaffirm *Margiotta*'s reliance-and-control theory in the public-sector context.

### 1.    *Margiotta* **Remains Valid After** *McNally.*

The text of § 1346, coupled with the history of its enactment, makes clear that Congress adopted *Margiotta*'s fiduciary-duty theory. Before *McNally*, all federal Courts of Appeals interpreted the mail and wire fraud statutes as

30

prohibiting honest-services fraud. *United States v. Napout*, 963 F.3d 163, 180 (2d Cir. 2020). But *McNally* "stopped the development of th[is] intangible-rights doctrine in its tracks." *Id.* (quoting *Skilling*, 561 U.S. at 401). There, the Supreme Court considered a Sixth Circuit case that, following *Margiotta*, had decided that "an individual without formal office [was] held to be a public fiduciary" because he "substantially participated in governmental affairs and exercised significant, if not exclusive, control" of certain governmental decisions. *McNally*, 483 U.S. at 355–56 (internal quotation marks omitted). The Court reversed, interpreting the mail fraud statute "as limited in scope to the protection of property rights." *Id.* at 360. At the same time, the Court invited Congress to "speak more clearly" if it "desires to go further." *Id.*

Congress answered this call the following year by enacting § 1346, the honest-services statute. *See Skilling*, 561 U.S. at 402. By doing so, "Congress amended the law specifically to cover one of the 'intangible rights' that lower courts had protected under § 1341 prior to *McNally*: 'the intangible right of honest services.'" *Cleveland v. United States*, 531 U.S. 12, 19–20 (2000) (quoting 18 U.S.C. § 1346). Put simply, Congress "effectively overruled *McNally*." *United States v.*

31

*Bahel*, 662 F.3d 610, 631 n.4 (2d Cir. 2011) (citing *United States v. Rybicki*, 354 F.3d 124, 136–37 (2d Cir. 2003) (en banc)).

That said, the enactment of § 1346 did not automatically revive all pre-*McNally* cases dealing with honest-services fraud. Instead, as we concluded in *Rybicki*, our pre-*McNally* caselaw in that space remains "pertinent," but not "'precedent' in the sense that it sets forth rules of law that we are bound to follow." 354 F.3d at 145. While *Rybicki* held that honest-services fraud in the *private* sector covered those "who assume a legal duty of loyalty comparable to that owed by an officer or employee," *id.* at 142 n.17, it expressly avoided discussing the reach of the honest-services fraud statute with respect to public corruption cases, *id.* at 138–39. Nor have we had occasion to revisit *Margiotta* to determine if its fiduciary-duty theory survives in the public-sector context after *McNally* and the enactment of § 1346.

In our view, § 1346 covers those individuals who are government officials as well as private individuals who are relied on by the government and who in fact control some aspect of government business. Our analysis begins, as it must, with the text of § 1346, *see N.Y. Legal Assistance Grp. v. Bd. of Immigr. Appeals*, 987 F.3d 207, 216 (2d Cir. 2021), which prohibits a "scheme or artifice to deprive

32

another of the intangible right of honest services," 18 U.S.C. § 1346. Although this language cannot be precisely defined "simply by consulting a dictionary for the literal, 'plain' meaning of the phrase," *Rybicki*, 354 F.3d at 135, the core meaning of the text encompasses "a legally enforceable claim to have another person provide labor, skill, or advice without fraud or deception," *id.* at 153 (Raggi, J., concurring in the judgment). On its face, the statute's capacious language is certainly broad enough to cover the honest services that members of the public are owed by their fiduciaries, even if those fiduciaries happen to lack a government title and salary.

This reading of the statute finds support from the historical understanding of the statute's language. As explained in *Rybicki*, we can "look to the case law from the various circuits that *McNally* overruled," understanding that the statute's language may have developed a "well-settled meaning" that Congress incorporated when adopting § 1346. *Id.* at 136–37 (majority opinion). In other words, those pre-*McNally* cases, while not technically binding, may shed useful light on what Congress meant when it spoke of "the intangible right of honest services," 18 U.S.C. § 1346. *See id.*

There is no question that many cases before *McNally* applied the honest-services doctrine to government officials. *McNally*, 483 U.S. at 362 & n.1 (Stevens,

J., dissenting) (collecting cases). Our caselaw since the enactment of § 1346 has done the same. *See, e.g.*, *Skelos*, 988 F.3d at 650, 653–54; *Silver*, 948 F.3d at 545, 575. We see no statutory basis for distinguishing a formal government employee, who is clearly covered by § 1346, from a functional employee who owes a comparable duty. *Cf. Rybicki*, 354 F.3d at 142 n.17 ("Although the bulk of the pre-*McNally* honest-services cases involved employees, we see no reason the principle they establish would not apply to other persons who assume a legal duty of loyalty comparable to that owed by an officer or employee to a private entity.").

Importantly, *McNally* directly overruled a Sixth Circuit case, *United States v. Gray*, 790 F.2d 1290 (6th Cir. 1986), that leaned heavily on *Margiotta*'s reliance-and-control theory. *See* 483 U.S. at 355–56. In fact, in language that foreshadowed the text of § 1346, *McNally* described that Sixth Circuit case as being part and parcel of "a line of decisions from the Courts of Appeals holding that the mail fraud statute proscribes schemes to defraud citizens of their *intangible rights to honest* and impartial government." *Id.* at 355 (emphasis added). And drawing from *Margiotta*, the Court then explained that, under this theory, "an individual without formal office may be held to be a public fiduciary if others rely on him '"because

34

of a special relationship in the government"' and he in fact makes governmental decisions." *Id.* (quoting *Gray*, 790 F.2d at 1296 (quoting *Margiotta*, 688 F.2d at 122)).

Because the Court in *McNally* outright rejected the entire doctrine of honest-services fraud, it had no occasion to directly rule on the *Margiotta*-based theory. But the Supreme Court's description of the settled doctrine nonetheless underscores the tight connection between *Margiotta*'s fiduciary-duty theory and the "intangible right of honest services." 18 U.S.C. § 1346. Based on the cases that *McNally* overturned, it stands to reason that Congress effectively reinstated the *Margiotta*-theory cases by adopting statutory language that covered the theory. *See Rybicki*, 354 F.3d at 136–37; *see also* 134 Cong. Rec. 32,708 (1988) (statement of Sen. Biden) (observing that the "intent [of § 1346] is to reinstate all of the pre-*McNally* caselaw pertaining to the mail and wire fraud statutes without change").

In the end, both the text and history of § 1346 lead us to conclude that the statute validates the instruction the district court gave here.

### 2. *McDonnell* Does Not Undermine *Margiotta*.

Rather than wrestle with the text or history of § 1346, the defendants mainly ground their challenge to *Margiotta* on the Supreme Court's decision in *McDonnell*, arguing that an "official act" can only be performed by an "official" with de jure

35

authority, because "to be official, the act must be something 'within the specific duties of [one's] official[] position – the function conferred by the authority of [one's] office.'"  Percoco Br. at 30 (second alteration in original) (quoting *McDonnell*, 136 S. Ct. at 2369).  But *McDonnell* merely interpreted the definition of "official act," which is "quite [a] different issue" from *who* can violate the honest-services statute.  *United States v. Halloran*, 821 F.3d 321, 340 n.13 (2d Cir. 2016).  It did not hold that only a formal government officer could perform an "official act."

Such a holding could not be reconciled with the text of § 201 in any event, since that provision defines the term "public official" to include both a traditional public officer, like a "Member of Congress," as well as "an officer or employee or person acting for or on behalf of the United States, or any department, agency or branch of [g]overnment thereof, . . . in any official function, *under or by authority of* any such department, agency, or branch of [g]overnment."  18 U.S.C. § 201(a)(1) (emphasis added).  As the Supreme Court noted in *Dixson v. United States*, the "proper inquiry is not simply whether the person had signed a contract with the United States or agreed to serve as the [g]overnment's agent, but rather whether the person occupies a position of public trust with official federal responsibilities."

36

465 U.S. 482, 496 (1984). In other words, it is not the formal employment role, but rather the fiduciary duty to the public, that defines an "official action."

Accordingly, *McDonnell*'s passing reference to "an official position" gives us no reason to doubt that someone who is functionally a government official can violate the honest-services fraud.

### 3. Constitutional Considerations Do Not Require Overturning *Margiotta*.

Aiello further argues that "three 'significant constitutional concerns'" – based on the First Amendment, due process, and federalism – should drive us to read § 1346 more narrowly to foreclose *Margiotta*'s fiduciary-duty theory. Aiello Br. at 32 (quoting *McDonnell*, 136 S. Ct. at 2372–73). Unfortunately for Aiello, we have repeatedly applied the reliance-and-control theory to § 1346 frauds committed in a variety of other contexts where no formal employment relationship existed. *See, e.g.*, *Halloran*, 821 F.3d at 337–40 (party chair accepting payment to influence party); *Rybicki*, 354 F.3d at 142 n.17 (collecting cases). Because the constitutional avoidance principles Aiello raises apply equally to these other cases, we see no reason to introduce a new requirement of formal *governmental* employment before a fiduciary duty may be deemed to arise under § 1346.

37

While Aiello insists that the First Amendment affords unique protection for citizens to petition and seek to influence the government, the First Amendment also protects the right of a person to speak persuasively to a private company. Indeed, the right of free speech and the right to petition the government are "cognate rights" that "share substantial common ground." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388 (2011) (internal quotation marks omitted). Cases implicating these rights are thus "generally subject to the same constitutional analysis." *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1059 (2d Cir. 1993) (internal quotation marks omitted); *accord McEvoy v. Spencer*, 124 F.3d 92, 97 n.1 (2d Cir. 1997). Consequently, it is not obvious why speech directed to the government would necessarily require special treatment. We therefore detect no First Amendment rationale for carving out an exception to § 1346 that would require formal employment *only* when defrauding the government (as opposed to a private party).

## C. The Gratuity Jury Instruction

Percoco next contends that it was error for the district court to instruct the jury that it could convict him for violating § 666 on the theory that he solicited or received a gratuity as a reward for some action. Although the precise basis for

Percoco's argument is unclear, he does not appear to question that a conviction under § 666 can be based on acceptance of gratuities. Nor could he. *See Skelos*, 988 F.3d at 660 (recognizing that, under binding caselaw, § 666 applies to gratuities and bribes). Rather, without any elaboration, Percoco argues that the jury instructions distinguished between a bribery theory and a gratuity theory only in "a perfunctory way," suggesting that the gratuity instruction, which did not track the government's bribery theory of the case, led to jury confusion and "paradoxical and contradictory verdicts." Percoco Br. at 53–54.

None of these unsupported arguments, however, rebuts "the law's general assumption that juries follow the instructions they are given." *United States v. Agrawal*, 726 F.3d 235, 258 (2d Cir. 2013); *see also United States v. Acosta*, 17 F.3d 538, 545 (2d Cir. 1994) ("[I]t has long been established that inconsistency in jury verdicts of guilty on some counts and not guilty on others is not a ground for reversal of the verdicts of guilty."). And because Percoco neither challenges the instruction as being inconsistent with the law nor contests the sufficiency of the evidence on this charge, we see no ground for reversal here.

**D.     The Constructive Amendment Challenge**

Aiello next contends that the district court's *Margiotta*-based instruction and the trial evidence introduced to support the fiduciary-duty theory amounted to a constructive amendment of, or a prejudicial variance from, the indictment, which never explicitly alleged that Percoco owed a fiduciary duty when he was running the Governor's reelection campaign.  Again, his argument is wide of the mark.

"[A] constructive amendment occurs either where (1) an additional element, sufficient for conviction, is added, or (2) an element essential to the crime charged is altered."  *Dove*, 884 F.3d at 146 (internal citation omitted).  Our precedent has "consistently permitted significant flexibility in proof, provided that the defendant was given *notice* of the *core* of criminality to be proven at trial."  *United States v. Banki*, 685 F.3d 99, 118 (2d Cir. 2012) (internal quotation marks omitted).  Put differently, the indictment must alert a defendant to "the essence of a crime, in general terms," but need not specify "the particulars of how a defendant effected the crime."  *United States v. D'Amelio*, 683 F.3d 412, 418 (2d Cir. 2012).  So, to prevail on a constructive amendment argument, a defendant "must demonstrate that either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was

40

convicted of conduct that was the subject of the grand jury's indictment." *United States v. Salmonese*, 352 F.3d 608, 620 (2d Cir. 2003) (internal quotation marks omitted).

Even if a defendant is unable to show a constructive amendment, he can still obtain relief if there was a prejudicial variance. A variance occurs "when the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment." *D'Amelio*, 683 F.3d at 417 (citing *Salmonese*, 352 F.3d at 621). A "defendant alleging variance must show 'substantial prejudice'" to warrant relief. *United States v. Rigas*, 490 F.3d 208, 226 (2d Cir. 2007) (quoting *United States v. McDermott*, 918 F.2d 319, 326 (2d Cir. 1990)). A variance is prejudicial only when it "infringes on the substantial rights that indictments exist to protect – to inform an accused of the charges against him so that he may prepare his defense and to avoid double jeopardy." *United States v. Dupre*, 462 F.3d 131, 140 (2d Cir. 2006) (internal quotation marks omitted).

Here, the indictment was not constructively amended as it clearly identified "the core of criminality to be proven at trial." *D'Amelio*, 683 F.3d at 417 (emphasis and internal quotation marks omitted). For starters, Count Ten of the indictment alleged that the honest-services fraud conspiracy occurred from 2014 until 2015,

41

which covers the period when Percoco left state office to run the reelection campaign. Moreover, the indictment set out the specific dates for Percoco's departure from state office and his return to his government, alleging that he was bribed during that time "in exchange for [his] official assistance." App'x at 292. And the indictment asserted that even after Percoco "officially left New York State employment to serve as campaign manager," he nevertheless "continued to function in a senior advisory and supervisory role with regard to the Governor's Office." *Id.* at 278–79.

Although the indictment did not expressly state that Percoco owed a fiduciary duty to the public after he formally resigned as Executive Deputy Secretary, the indictment's "generally framed" language "encompasse[d]" the *Margiotta* theory, *Salmonese*, 352 F.3d at 620 (internal quotation marks omitted), providing ample notice that the honest-services charge could include acts that occurred while Percoco technically lacked an official role in state government. Without a mismatch between the generally framed indictment and the *Margiotta* jury instruction, "there is no constructive amendment." *Id.*

Our conclusion is not at all disturbed by *United States v. Hassan*, in which we held that a conviction based on a particular type of drug that differed from the

drug alleged in the indictment would be an impermissible constructive amendment. 578 F.3d 108, 133–34 (2d Cir. 2008). Unlike this case, *Hassan* involved "'unique' due process issues" on account of the regulatory scheme tied to the narcotics at issue in that case, and consequently "required us to 'scrutinize the . . . instructions . . . very closely.'" *United States v. Andino*, 627 F.3d 41, 48 n.4 (2d Cir. 2010) (quoting *Hassan*, 578 F.3d at 132). The jury instruction there would have permitted a conviction for an offense distinct from what was charged in the indictment and in fact would have carried different penalties. *See Hassan*, 578 F.3d at 133–34; *see also D'Amelio*, 683 F.3d at 423 (distinguishing *Hassan* on the same grounds). Aiello falls far short of establishing that any of the purported amendments modified his offense or the range of penalties that he faced.

Nor has he shown any prejudicial variance between the indictment and evidence introduced at trial. To begin, there is no basis to conclude that "the evidence at trial prove[d] facts materially different from those alleged in the indictment," *D'Amelio*, 683 F.3d at 417 (quoting *Salmonese*, 352 F.3d at 621), since the indictment was far-reaching on its face. But even if Aiello could satisfy this prong, his argument would founder on the prejudice requirement. While Aiello contends that he had "no reason to lay an evidentiary foundation for arguments

that Percoco neither 'dominated' nor 'controlled' governmental business and that no one in state government – let alone the public – relied on him once he walked away from public office," Aiello Br. at 27, Aiello actually had significant incentive to develop such evidence at trial. After all, the § 666 bribery charge encompassed Percoco's time out of the office, and to prove that Aiello illegally paid a bribe or gratuity during that time, the government needed to establish that Percoco was an "agent" of the State of New York. 18 U.S.C. § 666(a)(2). Because Aiello already had every incentive to mount a defense distancing Percoco from the state government, we find that there was no prejudicial variance.

## E.    The Sufficiency of the Evidence

Percoco and Aiello also contest the sufficiency of the evidence supporting their convictions, arguing that there was no proof that Percoco agreed to take official action as to either scheme, and that the evidence failed to establish that he owed a fiduciary duty under *Margiotta*. Recall that a defendant making such a challenge "bears a heavy burden," *United States v. Heras*, 609 F.3d 101, 105 (2d Cir. 2010) (internal quotation marks omitted), because we "cannot substitute [our] own judgment for that of the jury as to the weight of the evidence and the reasonable inferences to be drawn therefrom," *Ng Lap Seng*, 934 F.3d at 130. Instead, we "must

consider the evidence in the light most favorable to the prosecution and uphold the conviction if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 129 (internal quotation marks omitted). Viewed in this light, there can be no doubt that the evidence proved the challenged elements.[4]

### 1. The Evidence Was Sufficient to Prove an Agreement to Perform Official Acts in the CPV Scheme.

First, Percoco contends that there was insufficient evidence that he agreed to commit any official act related to the CPV scheme because he simply set up meetings, which under *McDonnell* would not qualify as official acts. *See McDonnell*, 136 S. Ct. at 2371. But the Supreme Court did not hold that setting up a meeting can *never* evince an intent to take official action. To the contrary, the Court explained that, "[i]f an official sets up a meeting . . . on a question or matter

---

[4] Noting that the defendants did not renew their Rule 29 motions for acquittal at the close of all evidence, the government contends that the defendants must further bear the burden to demonstrate "plain error or manifest injustice." Gov't Br. at 106 (quoting *United States v. Finley*, 245 F.3d 199, 202 (2d Cir. 2001)). But the case on which the government relies, *United States v. Finley*, applied the "plain error or manifest injustice" standard where the defendant moved for acquittal, the district court then denied the motion, and the defendant subsequently failed to renew that motion at the end of the trial. *See* 245 F.3d at 202. Here, by contrast, the district court reserved decision on the defendants' Rule 29 motions, opting to deny them after the jury returned its verdict. Under this scenario, it would appear that "the defendant is not required to take any additional procedural steps to preserve the issue for appellate review." *United States v. Wahl*, 290 F.3d 370, 374 (D.C. Cir. 2002). We need not definitively resolve the issue, however, because Percoco and Aiello cannot bear the ordinary "heavy burden" that applies to sufficiency challenges. *See Heras*, 609 F.3d at 105.

that is or could be pending before another official, that could serve as evidence of an agreement to take an official act" because a jury could conclude "that the official was attempting to pressure or advise another official on a pending matter." *Id.* That is exactly what the evidence demonstrated here. Take, for instance, the email from Howe advising Percoco that, to "keep the ziti flowing," Percoco had to "[h]old" another official's "feet to the fire" to obtain the Power Purchase Agreement. Suppl. App'x at 30. And in the same exchange, Percoco agreed to "push" the official to discourage the state from awarding a Power Purchase Agreement to a competitor of CPV. *Id.*

In addition, Kelly specifically requested that Percoco act on the Reciprocity Agreement, as he needed a "push from above." *Id.* at 8–10. In response, Percoco – whose wife was then receiving monthly payments for a low-show job – agreed to contact a state commissioner, which alone bolsters a finding of the bribery scheme. *See United States v. Triumph Cap. Grp.*, 544 F.3d 149, 162 (2d Cir. 2008) (noting that pay for unperformed work provided "strong support" for the existence of a bribery scheme); *see also Biaggi*, 909 F.2d at 684. When the illness of Percoco's mother made it impossible for him to directly intervene, Percoco then emailed Kelly to refer him to two other government officials in the Executive

46

Chamber. Kelly, in turn, forwarded this email to a state official – copying Percoco to show his tacit agreement – to move it forward. Although Percoco contends that, by directing Kelly to two other officials in the Executive Chamber, he showed his intent *not* to act on the Reciprocity Agreement, the evidence allowed the jury to reach the exact opposite conclusion. From the series of communications between Percoco and Kelly, the jury was entitled to infer that Percoco intended to influence a pending government matter, even when personal circumstances prevented him from doing so directly, by means of a referral. *See United States v. White*, 7 F.4th 90, 101 (2d Cir. 2021) ("We defer to the jury's rational . . . choice of the competing inferences that can be drawn from the evidence." (internal quotation marks omitted)).

### 2. The Evidence Was Sufficient to Prove an Agreement to Perform Official Acts in the COR Development Scheme.

Percoco also argues that the evidence was inadequate to prove that he agreed to perform an official act as to the COR Development scheme. Specifically, Percoco argues that his call to Kennedy about the Labor Peace Agreement was not an official act because Kennedy and other senior officials already believed the Labor Peace Agreement was not required. But the testimony at trial demonstrated

that COR Development had struggled unsuccessfully to remove the Labor Peace

Agreement requirement – until Percoco stepped in and pressured Kennedy to act.

In any event, Percoco's argument is really beside the point: All that

ultimately matters is Percoco's *agreement* to perform official action, not his

execution of the deal. *See Silver*, 948 F.3d at 551–52. It is enough that the evidence

introduced at trial demonstrated that Percoco, owing a fiduciary duty to the

public, nevertheless accepted Aiello's invitation to become COR Development's

"advocate with regard to labor issues." App'x at 680. And the mere fact that

Kennedy or other officials were inclined to take the steps that Percoco pushed

them to take is not a defense. *See City of Columbia v. Omni Outdoor Advert., Inc.*, 499

U.S. 365, 378 (1991) (noting that an official "is guilty of accepting a bribe even if he

would and should have taken, in the public interest, the same action for which the

bribe was paid"); *United States v. Alfisi*, 308 F.3d 144, 150–51 (2d Cir. 2002) (rejecting

argument that bribery "requires evidence of an intent to procure a violation of the

public official's duty," and stating there "there is no lack of sound legislative

purpose in defining bribery to include payments in exchange for an act to which

the payor is legally entitled").

**3.     The Evidence Was Sufficient to Establish Percoco's Fiduciary Duty.**

Aiello and Percoco further argue that there was insufficient evidence that Percoco owed New York State a duty of honest services while he was managing the Governor's campaign. But when viewed in the light most favorable to the government, the evidence reflects that Percoco exercised sufficient control and reliance to trigger a duty of honest services under *Margiotta*. *See* 688 F.2d at 125.

Before he left the government to manage the sitting Governor's reelection campaign, Percoco's official role was that of Executive Deputy Secretary to the Governor. To many in the administration, this role was among the highest-ranking positions in New York State's executive department. Among other things, Percoco had power over the Executive Chamber's budget, personnel decisions, and operations. He also had a significant role in overseeing labor relations, governmental affairs, and legislative affairs, and he worked closely with the Governor and other senior officials in the Executive Chamber. Percoco's power was amplified by his unique relationship with Governor Cuomo; he had worked with Governor Cuomo in a number of roles, and was known for being close to him and his family.

The government's theory at trial was that, for all practical purposes, Percoco maintained the same position of power and trust in the state throughout his time on the campaign trail. And that theory finds ample record support. For starters, no one ever formally replaced Percoco in his role as Executive Deputy Secretary. Rather, as early as August 7, 2014, Percoco represented that he had a guaranteed position with Cuomo's administration after the election, and he did in fact return – as Executive Deputy Secretary – four months later. Throughout the election campaign, Percoco also held onto and used his Executive Chamber telephone, desk, and office, where he continued to conduct state business. Percoco himself bragged in an email that he retained "a bit of clout" even after formally leaving the administration. App'x at 697.

Several individuals testified that Percoco maintained control over official matters. Howe, for instance, testified that "regardless of whether he was in the campaign or he was in the governor's office physically, [Percoco] had the ability to pick up the phone and get things done." *Id.* at 552. Howe witnessed Percoco "pick up the phone and call the governor's staff from the campaign on many occasions" to discuss "campaign and non-campaign business" alike, and overheard Percoco "instruct them on various [non-campaign] topics." Suppl.

App'x at 437–38; *see also* App'x at 567–69 (testimony regarding pressure Percoco exerted to prevent staff from leaving the administration). From Howe's perspective, Percoco's grip on power never changed, diminished, or dissipated as he managed the campaign.

This was generally consistent with the testimony of those in the Governor's administration. For instance, Kennedy testified that Percoco helped organize a state event, attended a government briefing about an impending winter storm, and discussed the terms of a redevelopment project with government employees – all while Percoco was technically out of office. Another government employee stated that Percoco continued to be an advisor to the Governor and to coordinate both the Governor's official and campaign schedules. And another testified that she called Percoco to solicit his advice on pending legislation related to public-sector unions.

While Aiello views Percoco as failing to exercise the same level of control as the defendant in *Margiotta*, a rational jury could certainly disagree. In at least some respects, Percoco maintained firmer control over the government's decisions than the defendant in *Margiotta*, who never officially held public office. *See* 688 F.2d at 113, 122. Percoco, of course, held an official position as the Executive Deputy

51

Secretary to the Governor, returned to that position after managing the campaign, and maintained significant control over government decisions throughout the campaign.

And though Aiello disputes his knowledge of Percoco's control, the trial evidence reflected that Aiello specifically sought out Percoco to use his position of power to push the Labor Peace Agreement through. He explicitly recognized the power that Percoco wielded to accomplish this, even while "he [wa]s off the 2nd floor working on the Campaign." App'x at 680. Importantly, Aiello's payments to Percoco took a circuitous route through an entity Howe controlled, which likewise could have prompted a rational jury to conclude that Aiello understood that the payments were designed to compensate Percoco for unlawful conduct. *Cf. Rybicki*, 354 F.3d at 142 ("At the end of the day, we simply cannot believe that [the defendants] did not know that they were courting prosecution and conviction for mail and wire fraud when they undertook to use the wires and the mails, in effect, to pay off insurance adjustors, while assiduously covering their tracks."). We therefore affirm the defendants' convictions on Counts Nine, Ten, and Eleven.

**F.     The Forfeiture Order**

Finally, Percoco argues that the district court erred in finding that all of the funds paid to his wife pursuant to the CPV scheme were forfeitable. Federal law provides for the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to" certain identified offenses, including "bribery of a public official." *See* 18 U.S.C. §§ 981(a)(1)(C), 1956(c)(7)(B)(iv). For crimes "involving . . . illegal services [or] unlawful activities, . . . the term 'proceeds' means property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto," so "proceeds" are "not limited to the net gain or profit realized from the offense." *Id*. § 981(a)(2)(A). "'[U]nlawful activities' include 'inherently unlawful activit[ies], like say the sale of foodstamps, or a robbery.'" *See United States v. Bodouva*, 853 F.3d 76, 80 (2d Cir. 2017) (second alteration in original) (quoting *United States v. Contorinis*, 692 F.3d 136, 145 n.3 (2d Cir. 2012)). In other words, where the criminal conduct cannot ever be conducted legally, the gross proceeds of the crime are forfeitable.

By contrast, "[i]n cases involving . . . lawful services that are sold or provided in an illegal manner, the term 'proceeds' means the amount of money

acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services." 18 U.S.C. § 981(a)(2)(B). Section "981(a)(2)(B) applies in, for example, insider trading cases because [a] security is a lawful good[] for the purposes of § 981(a)(2)(B), . . . which, if [purchased or sold] based upon improperly obtained material nonpublic inside information, is sold . . . in an illegal manner." *Bodouva*, 853 F.3d at 79–80 (alterations in original) (internal quotation marks omitted). In such cases, the defendant has "the burden of proof with respect to the issue of direct costs." 18 U.S.C. § 981(a)(2)(B); *see also United States v. Mandell*, 752 F.3d 544, 554 (2d Cir. 2014).

The district court ordered Percoco to forfeit $320,000, which included the $35,000 consulting fee related to COR Development and $285,000 that his wife, Lisa Percoco, received as compensation for leading an education program.

Percoco argues on appeal, as he did before the district court, that Lisa Percoco's actions were not "inherently unlawful," and thus the bona fide services she rendered to CPV, which Percoco calculated to be $2,500 per month, should be subtracted from the forfeiture amount. But this argument misunderstands the criminal conduct at the heart of this case. *See Bodouva*, 853 F.3d at 80. At issue here

was not an education-consultant position conducted unlawfully; rather, the position was a farce – merely the means to execute and conceal an illegal bribery scheme. As the district court found, regardless of the value Lisa Percoco provided as an educator, she would not have received the job absent the bribery scheme, which obviously could not be carried out lawfully. Her low-show job was a cover for, and in furtherance of, the illegal bribery scheme; any legitimate value she added was, at most, an incidental by-product of the fraud. Accordingly, the criminal conduct involved "unlawful activities" under subsection (A), rather than "lawful services" sold in an illegal manner under subsection (B). 18 U.S.C. § 981(a)(2); *see also Bodouva*, 853 F.3d at 80. We thus affirm the forfeiture order.

## IV.   CONCLUSION

For the reasons stated above, the judgment of the district court is **AFFIRMED**.