*PRELIMINARY PRINT*

VOLUME 598 U. S. PART 2

PAGES 319–338

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

MAY 11, 2023

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published. Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D.C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# PERCOCO *v.* UNITED STATES ET AL.

## CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 21–1158. Argued November 28, 2022—Decided May 11, 2023

Petitioner Joseph Percoco served as the Executive Deputy Secretary to New York Governor Andrew Cuomo from 2011 to 2016, a position that gave him a wide range of influence over state decision-making, with one brief hiatus. During an eight-month period in 2014, Percoco resigned from government service to manage the Governor's reelection campaign. During this hiatus, Percoco accepted payments totaling $35,000 to assist a real-estate development company owned by Steven Aiello in its dealings with Empire State Development, a state agency. After Percoco urged a senior official at ESD to drop a requirement that Aiello's company enter into a "Labor Peace Agreement" with local unions as a precondition to receiving state funding for a lucrative project, ESD informed Aiello the following day that the agreement was not necessary. When Percoco's dealings came to the attention of the U. S. Department of Justice, he was indicted and charged with, among other things, conspiracy to commit honest-services wire fraud in relation to the labor-peace requirement (count 10). See 18 U. S. C. §§ 1343, 1346, 1349. Throughout the proceedings, Percoco argued unsuccessfully that a private citizen cannot commit or conspire to commit honest-services wire fraud based on his own duty of honest services to the public. Over Percoco's objection, the trial court instructed the jury that Percoco could be found to have had a duty to provide honest services to the public during the time when he was not serving as a public official if the jury concluded, first, that "he dominated and controlled any governmental business" and, second, that "people working in the government actually relied on him because of a special relationship he had with the government." As relevant here, the jury convicted Percoco on count 10. On appeal, the Second Circuit affirmed, explaining that the challenged jury instruction fit the Second Circuit's understanding of honest-services fraud as adopted many years earlier in *United States* v. *Margiotta*, 688 F. 2d 108.

*Held*: Instructing the jury based on the Second Circuit's 1982 decision in *Margiotta* on the legal standard for finding that a private citizen owes the government a duty of honest services was error. Pp. 325–333.

(a) Prior to this Court's 1987 decision in *McNally* v. *United States*, 483 U. S. 350, "all Courts of Appeals had embraced" the view that the

federal wire fraud and mail fraud statutes proscribe what came to be
known as "honest-services fraud." *Skilling* v. *United States*, 561 U. S.
358, 401. Most cases prosecuted under these statutes involved public
employees accepting a bribe or kickback that did not necessarily result
in a financial loss for the government employer but did deprive the gov-
ernment of the right to receive honest services. See *id.*, at 400–401.
The Second Circuit considered a different fact pattern in *Margiotta*, in
which the government had charged an unelected individual with honest-
services mail fraud for using his position as a political-party chair to
exert substantial control over public officials. The court held that a
private person could commit honest-services fraud if he or she "domi-
nate[d] government." 688 F. 2d, at 122. Shortly after *Margiotta*, how-
ever, this Court rejected the entire concept of honest-services fraud in
*McNally*. But "Congress responded swiftly" to *McNally*, and enacted
18 U. S. C. § 1346, which provides that "'the term "scheme or artifice to
defraud,"'" which appears in both § 1341 and § 1343, "'includes a scheme
or artifice to deprive another of the intangible right of honest services.'"
*Skilling*, 561 U. S., at 402 (quoting § 1346). Decades later in *Skilling*,
this Court rejected the broad argument that § 1346 is unconstitutionally
vague and clarified that "the intangible right of honest services" in
§ 1346 relates to "fraudulent schemes to deprive another of honest serv-
ices through bribes or kickbacks supplied by a third party who had not
been deceived." 561 U. S., at 404.

*Skilling*'s approach informs the Court's decision in this case. The
Second Circuit concluded that "Congress effectively reinstated the
*Margiotta*-theory cases by adopting statutory language that covered the
theory." 13 F. 4th 180, 196. But *Skilling* took care to avoid giving
§ 1346 an indeterminate breadth that would sweep in any conception of
"intangible rights of honest services" recognized by some courts prior to
*McNally*. By rejecting the Government's argument that § 1346 should
apply to cases involving "'undisclosed self-dealing by a public official or
private employee,'" 561 U. S., at 409, the *Skilling* Court made clear that
"the intangible right of honest services" must be defined with the clarity
typical of criminal statutes and should not be held to reach an ill-defined
category of circumstances simply because of a few pre-*McNally* deci-
sions. Pp. 325–329.

(b) Percoco's arguments challenging the honest-services conspiracy
count against him—that he was out of public office during part of the
time period within the indictment and that a private citizen cannot be
convicted of depriving the public of honest services—sweep too broadly.
The Court rejects the idea that a person nominally outside public em-
ployment can *never* have the necessary fiduciary duty to the public.
Through principles of agency, an individual who is not a formal employee

Syllabus

of a government may become an actual agent of the government by agreement, and thereby have a fiduciary duty to the government and thus to the public it serves. While the Court rejects the absolute rule, "the intangible duty of honest services" codified in § 1346 plainly does not extend a duty to the public to *all* private persons, and the Court therefore addresses if *Margiotta* states the correct test. Pp. 329–330.

(c) The jury instructions based on the *Margiotta* theory in Percoco's case were erroneous. *Margiotta*'s standard in the instructions—implying that the public has a right to a private person's honest services whenever that private person's clout exceeds some ill-defined threshold—is too vague. Without further constraint, the jury instructions did not define "the intangible right of honest services" "'with sufficient definiteness that ordinary people can understand what conduct is prohibited'" or "'in a manner that does not encourage arbitrary and discriminatory enforcement.'" *McDonnell* v. *United States*, 579 U. S. 550, 576.

The Government does not defend the jury instructions as an accurate statement of the law, but instead claims that the imprecision in the jury instructions was harmless error. The Government argues that a private individual owes a duty of honest services in the discrete circumstances (1) "when the person has been selected to work for the government" in the future and (2) "when the person exercises the functions of a government position with the acquiescence of relevant government personnel." Brief for United States 25. These theories, however, differ substantially from the instructions given the jury in this case, and the Second Circuit did not affirm on the basis of either of them. Pp. 330–333.

13 F. 4th 180, reversed and remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SOTOMAYOR, KAGAN, KAVANAUGH, and BARRETT, JJ., joined, and in which JACKSON, J., joined as to all but Part II–C–2. GORSUCH, J., filed an opinion concurring in the judgment, in which THOMAS, J., joined, *post*, p. 333.

*Yaakov M. Roth* argued the cause for petitioner. With him on the briefs were *Michael J. Rubenstein*, *Barry A. Bohrer*, and *Michael L. Yeager*. *Alexandra A. E. Shapiro*, *Ted Sampsell-Jones*, and *Daniel J. O'Neill* filed briefs for respondent Steven Aiello under this Court's Rule 12.6, in support of petitioner.

Opinion of the Court

*Nicole Frazer Reaves* argued the cause for the United States. With her on the brief were *Solicitor General Prelogar, Assistant Attorney General Polite, Deputy Solicitor General Feigin*, and *John-Alex Romano.*\*

Justice Alito delivered the opinion of the Court.†

In this case, we consider whether a private citizen with influence over government decision-making can be convicted for wire fraud on the theory that he or she deprived the public of its "intangible right of honest services." 18 U. S. C. §§ 1343, 1346. Petitioner Joseph Percoco was charged with conspiring to commit honest-services wire fraud during a period of time that included an eight-month interval between two stints as a top aide to the Governor of New York. Percoco was convicted of this offense based on instructions that required the jury to determine whether he had a "special relationship" with the government and had "dominated and controlled" government business. 2 App. 511. We conclude that this is not the proper test for determining whether a private person may be convicted of honest-services fraud, and we therefore reverse and remand for further proceedings.

I

Percoco was a longtime political associate of former New York Governor Andrew Cuomo. Except for a brief but important hiatus in 2014, Percoco served as the Governor's Executive Deputy Secretary from 2011 to 2016, and that position gave him a wide range of influence over state decision-

---

*Briefs of *amici curiae* urging reversal were filed for Citizens United et al. by *Gary M. Lawkowski, Michael Boos*, and *Daniel H. Jorjani*; for the National Association of Criminal Defense Lawyers by *Joshua L. Dratel* and *Steven F. Molo*; and for the New York Council of Defense Lawyers by *Harry Sandick*.

*Roman Martinez* filed a brief for the Chamber of Commerce of the United States of America as *amicus curiae*.

†Justice Jackson joins all but Part II–C–2 of this opinion.

making. In April 2014, Percoco resigned from this position to manage the Governor's reelection campaign, but after the Governor was reelected, he resumed his role as Executive Deputy Secretary in December 2014.

The question we address today arises from Percoco's activities during his break in government service. In July 2014, Empire State Development (ESD), a state agency, informed developer Steven Aiello that his real-estate company, COR Development, needed to enter into a "Labor Peace Agreement" with local unions if he wished to receive state funding for a lucrative project. *Id.*, at 597. Interested in avoiding the costs of such an agreement, Aiello reached out to Percoco through an intermediary so that Percoco could "help us with this issue while he is off the 2nd floor," *i. e.*, the floor that housed the Governor's office. *Id.*, at 594. Percoco agreed and received two payments totaling $35,000 from Aiello's company in August and October 2014. On December 3, mere days before returning to his old job, Percoco called a senior official at ESD and urged him to drop the labor-peace requirement. ESD promptly reversed course the next day and informed Aiello that the agreement was not necessary.

Percoco's dealings in this and other matters later came to the attention of the United States Department of Justice, which obtained a multi-count indictment against Percoco and others for engaging in several allegedly illegal schemes.[1] Percoco was charged with two counts of conspiring to commit honest-services wire fraud, in violation of 18 U. S. C. §§ 1343, 1346, and 1349; two counts of soliciting bribes and gratuities, in violation of § 666(a)(1)(B); and three counts of Hobbs Act extortion, in violation of § 1951. 1 App. 96–103. Only the wire fraud conspiracy count relating to the labor-peace requirement (count 10) is directly at issue before this Court.

_____

[1] Louis Ciminelli, see No. 21–1170, was also named in this indictment but not in the counts at issue in this case.

That count alleged a conspiracy running "[f]rom at least in or about 2014, up to and including in or about 2015," that is, both during the time when Percoco was formally employed in the Governor's office and during the period when he was working on the Governor's campaign. See *id.*, at 100 (incorporating ¶4 and ¶¶33–35 of the indictment). Before trial, Percoco moved for dismissal of that count—and another conspiracy count overlapping with the campaign period—on the ground that a private citizen cannot commit or conspire to commit honest-services wire fraud based on his own duty of honest services to the public. See *id.*, at 130, 133. The District Court denied that motion, noting that the indictment alleged that Percoco, while formally working on the Governor's campaign, had "'continued to function in a senior advisory and supervisory role with regard to the Governor's Office'" and had "'continued to be involved in the hiring of staff and the coordination of the Governor's official events and priorities . . . among other responsibilities.'" *Id.*, at 133 (quoting *id.*, at 77, Indictment ¶4).

At trial, the prosecution introduced evidence to support the indictment's allegations about Percoco's activities during his break in official service, as well as evidence that he had expressed his intent and had made plans to resume official service after the election. See 13 F. 4th 180, 201–203 (CA2 2021). At the end of the prosecution's case, Percoco again moved for judgment of acquittal on count 10, contending that no evidence showed that he had taken any act in furtherance of that conspiracy while serving in an official government capacity. *Id.*, at 187.

The court reserved decision on that motion, *ibid.*, and the case was submitted to the jury. Over defense counsel's objection, the court instructed that Percoco could be found to have had a duty to provide honest services to the public during the time when he was not serving as a public official if the jury concluded, first, that "he dominated and controlled any governmental business" and, second, that "people work-

ing in the government actually relied on him because of a special relationship he had with the government." 2 App. 511. The jury convicted Percoco on count 10, as well as two other charged counts relating to additional conduct, but acquitted him on the other charges. The court then denied Percoco's motion for judgment of acquittal, and he was sentenced to 72 months' imprisonment. 13 F. 4th, at 187–188.

On appeal, the Second Circuit affirmed. The court explained that the "fiduciary-duty [jury] instruction" given by the trial judge "fi[t] comfortably" with, and in fact restated, the understanding of honest-services fraud that the Second Circuit had adopted many years earlier in *United States* v. *Margiotta*, 688 F. 2d 108 (1982). See 13 F. 4th, at 194 (noting that Percoco and his co-defendants "seem to agree that the district court's fiduciary-duty instruct[ion] falls within *Margiotta*"). Based on that precedent, the court also rejected Percoco's claim that there was insufficient evidence to prove that he had "owed New York State a duty of honest services while he was managing the Governor's campaign." *Id.*, at 201.

Percoco sought this Court's review, asking us to decide whether a private citizen who "has informal political or other influence over governmental decisionmaking" can be convicted of honest-services fraud. Pet. for Cert. i. We granted certiorari. 597 U. S. —— (2022).[2]

## II

### A

As noted, the decision below was based squarely on the Second Circuit's 1982 decision in *Margiotta*, and we there-

---

[2] Percoco did not petition for review of the Second Circuit's affirmance of the two other convictions relating to additional conduct, including a conviction that also charged conspiracy to commit honest-services fraud. See Pet. for Cert. 8. He now argues that reversal of his conviction on the wire fraud conspiracy count before the Court necessitates reversal of these other counts due to "prejudicial spillover." Brief for Petitioner 20. We do not reach this question.

fore begin by briefly recounting the events that led up to and followed that decision.   The federal wire fraud statute, § 1343 (like the older federal mail fraud statute, § 1341), targets the use of certain instrumentalities to advance "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."   Before 1987, "all Courts of Appeals had embraced" the view that these statutes proscribe what came to be known as "honest-services fraud."   *Skilling* v. *United States*, 561 U. S. 358, 401 (2010).   In most of these cases, public employees had accepted a bribe or kickback in exchange for dishonest conduct that did not necessarily cause their employers to suffer a financial loss, but this conduct was found to constitute mail or wire fraud because it deprived the relevant government unit (and thus, by extension, the public) of the right to receive honest services.   See *id.*, at 400–401.

In *Margiotta*, the Second Circuit faced a case that departed from this pattern.   Joseph Margiotta chaired the Republican Party Committees for Nassau County and the town of Hempstead, New York, and he used the influence that came with those positions to carry out a kickback scheme. He was indicted for honest-services mail fraud, and although he held "no elective office," the prosecution argued that he nevertheless breached a duty to render honest services because his party positions "afforded him sufficient power and prestige to exert substantial control over public officials." 688 F. 2d, at 113.

A divided Second Circuit panel agreed.   The majority found that "there is no precise litmus paper test" for determining when a private person "owes a fiduciary duty to the general citizenry" but that "two time-tested measures of fiduciary status [were] helpful."   *Id.*, at 122.   These were (1) whether "others rel[ied] upon [the accused] because of [his] special relationship in the government" and (2) whether he

exercised "de facto control" over "governmental decisions." *Ibid.* Admitting that the case before it was "novel" and that determining when a private person owes a duty of honest services was "a most difficult enterprise," the majority nevertheless concluded that a private person could commit honest-services fraud if he or she "dominate[d] government." *Id.*, at 121–122. In a strongly worded partial dissent, Judge Winter complained that the majority's interpretation lacked "the slightest basis in Congressional intent, statutory language or common canons of statutory interpretation" and that it erroneously treated a variety of "politically active persons" who have informal but strong influence over government as subject to the same duties as officeholders. *Id.*, at 142 (opinion concurring in part and dissenting in part).

This Court declined to review the Second Circuit's decision, 461 U. S. 913 (1983), but that decision's life as Second Circuit precedent was short-lived. In *McNally* v. *United States*, 483 U. S. 350 (1987), the Court considered a similar case, and rather than addressing the application of honest-services fraud to private persons, the Court rejected the entire concept of honest-services fraud and held that the mail fraud statute was "limited in scope to the protection of property rights." *Id.*, at 358, 360.

*McNally*'s holding on honest-services fraud, however, lasted for less time than *Margiotta*'s. "Congress responded swiftly" and enacted 18 U. S. C. § 1346, which provides that the "'the term "scheme or artifice to defraud,"'" which appears in both § 1341 and § 1343, "'includes a scheme or artifice to deprive another of the intangible right of honest services.'" *Skilling*, 561 U. S., at 402 (quoting § 1346).

Decades later, this Court considered and rejected the broad argument that § 1346 is unconstitutionally vague, and in doing so, clarified the meaning of the phrase "the intangible right of honest services." *Id.*, at 402–405. Noting § 1346's use of "'[t]he definite article "the"'" in the phrase

"*the* intangible right of honest services," we held that § 1346 covers the "core" of pre-*McNally* honest-services case law and did not apply to "'*all* intangible rights of honest services whatever they might be thought to be.'" 561 U. S., at 404–405 (quoting *United States* v. *Rybicki*, 354 F. 3d 124, 137–138 (CA2 2003) (en banc)). And we observed that "[i]n the main, the pre-*McNally* cases involved fraudulent schemes to deprive another of honest services through bribes or kickbacks supplied by a third party who had not been deceived." 561 U. S., at 404. We reasoned that those engaging in such schemes had sufficient reason to know that their conduct was proscribed. *Id.*, at 407, 410, 412.

*Skilling's* approach informs our decision in this case. Here, the Second Circuit concluded that "Congress effectively reinstated the *Margiotta*-theory cases by adopting statutory language that covered the theory." 13 F. 4th, at 196. But *Skilling* was careful to avoid giving § 1346 an indeterminate breadth that would sweep in any conception of "intangible rights of honest services" recognized by some courts prior to *McNally*.

This is illustrated by *Skilling's* rejection of the Government's argument that § 1346 should be held to reach cases involving "'undisclosed self-dealing by a public official or private employee—*i. e.*, the taking of official action by the employee that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty.'" 561 U. S., at 409–410. Because the pre-*McNally* lower court decisions involving such conduct were "inconsisten[t]," we concluded that this "amorphous category of cases" did not "constitute core applications of the honest-services doctrine." 561 U. S., at 410.

*Skilling's* teaching is clear. "[T]he intangible right of honest services" must be defined with the clarity typical of criminal statutes and should not be held to reach an ill-defined category of circumstances simply because of a smat-

tering of pre-*McNally* decisions. With this lesson in mind, we turn to the question whether the theory endorsed by the lower courts in this case gave §1346 an uncertain breadth that raises "the due process concerns underlying the vagueness doctrine." See 561 U. S., at 408.

B

As noted, Percoco moved before trial for dismissal of the honest-services conspiracy count at issue on the ground that he was out of public office during part of the time period within the indictment and that a private citizen cannot be convicted of depriving the public of honest services. See Defendant's Memorandum of Law in Support of Motion To Dismiss the Superseding Indictment in No. 1:16–cr–00776 (SDNY, May 19, 2017), ECF Doc. 187, pp. 25–30. He advanced a similar theory in his motion for acquittal, emphasizing that he was acting under "a short-term agreement [with Aiello's firm] within the period in which he was no longer a state employee." 1 App. 447.

On this point, Percoco's arguments sweep too broadly. To be sure, the pre-*McNally* record on honest-services fraud is clearest when the Government seeks to prosecute actual public officials. Most of the pre-*McNally* honest-services prosecutions, including what appears to be the first case to adopt that theory, involved actual public officials. See *Skilling*, 561 U. S., at 400–401 (citing *Shushan* v. *United States*, 117 F. 2d 110, 115 (CA5 1941)). But we reject the argument that a person nominally outside public employment can *never* have the necessary fiduciary duty to the public. Without becoming a government employee, individuals not formally employed by a government entity may enter into agreements that make them actual agents of the government. An "agent owes a fiduciary obligation to the principal," see, *e. g.*, 1 Restatement (Third) of Agency §1.01, Comment *e*, p. 23 (2005), and therefore an agent of the government has a fidu-

ciary duty to the government and thus to the public it serves. In this Court, Percoco has agreed that individuals who are "delegated authority to act on behalf" of a public official and to perform government duties have a duty to provide honest services. Tr. of Oral Arg. 12; see also Brief for Petitioner 22, 24, 37; Reply Brief 9. This well-established principle suffices to confirm that the lower courts correctly rejected Percoco's *per se* rule and, in doing so, did not stretch § 1346 past heartland cases. See *Skilling*, 561 U. S., at 408.

Rejecting this absolute rule, however, is not enough to sustain Percoco's convictions on the wire fraud conspiracy counts. "[T]he intangible right of honest services" codified in § 1346 plainly does not extend a duty to the public to *all* private persons, and whether the correct test was applied in this case returns us to *Margiotta*.

## C

Percoco challenges the *Margiotta* theory that underlay the jury instructions in this case, and we must therefore decide whether those instructions are correct. We hold that they are not.

### 1

Directly applying *Margiotta*, the trial judge told the jury that Percoco owed a duty of honest services to the public if (1) he "dominated and controlled any governmental business" and (2) "people working in the government actually relied on him because of a special relationship he had with the government." 2 App. 511; see *Margiotta*, 688 F. 2d, at 122. But *Margiotta*'s standard is too vague. From time immemorial, there have been *éminence grises*, individuals who lacked any formal government position but nevertheless exercised very strong influence over government decisions. Some of these individuals have been reviled; others have been respected as wise counselors. The *Margiotta* test

could be said to apply to many who fell into both of these camps. It could also be used to charge particularly well-connected and effective lobbyists. See *id.*, at 142 (opinion of Winter, J.). *Margiotta* acknowledged that "the public has no right to disinterested service" from lobbyists and political party officials, but the rule it developed—which was embodied in the jury instructions given in this case—implies that the public *does* hold such a right whenever such persons' clout exceeds some ill-defined threshold. *Id.*, at 122. *Margiotta* set a low bar, *i. e.*, the point at which a defendant's influence goes beyond "minimum participation in the processes of government." *Ibid.* The instructions in this case demanded more, viz., proof of "dominat[ion]," but what does that mean in concrete terms? Is it enough if an elected official almost always heeds the advice of a long-time political adviser? Is it enough if an officeholder leans very heavily on recommendations provided by a highly respected predecessor, family member, or old friend? Without further constraint, *Margiotta* does not (and thus, the jury instructions did not) define "the intangible right of honest services" "'with sufficient definiteness that ordinary people can understand what conduct is prohibited,'" or "'in a manner that does not encourage arbitrary and discriminatory enforcement.'" *McDonnell* v. *United States*, 579 U. S. 550, 576 (2016) (quoting *Skilling*, 561 U. S., at 402–403).

2

The Government does not defend these jury instructions as an accurate statement of the law, but it argues that their imprecision was harmless. Specifically, the Government argues that a private individual owes a duty of honest services to the public "in two discrete circumstances": (1) "when the person has been selected to work for the government" in the future and (2) "when the person exercises the functions of a government position with the acquiescence of relevant gov-

ernment personnel." Brief for United States 25; cf. 18 U. S. C. § 201(b) (federal bribery statute incorporating "person[s] selected to be a public official").[3]

The first theory differs substantially from the jury instructions, which did not tell the jury that Percoco could be found to owe a duty of honest services because he had been selected for future government service. While the prosecution offered evidence that Percoco intended to return to government service after the election and had made plans to do so, the jury could have found that the requirements set out in the jury instructions were satisfied without relying on that evidence. Thus, even if we assume for the sake of argument that there is some merit in the Government's first new theory, it is far from clear that the erroneous jury instructions would be harmless.

The Government's second new theory—*i. e.*, that a private citizen owes a duty to render honest services "when the person exercises the functions of a government position with the acquiescence of relevant government personnel"—appears, as defined in its brief, to restate *Margiotta*'s erroneous construction of the law. See Brief for United States 33 (instructions "as a whole and in the context of this case . . . correctly conveyed" this test). Moreover, the jury was not told that it was necessary to find that "relevant government personnel" "acquiesce[d]" in Percoco's exercise of government functions.

In short, the jury instructions are substantially different from either of the Government's new theories, and the Second Circuit—which treated even the language the Govern-

---

[3] The Government also alluded to a possible third theory at oral argument, saying that there were "indicia throughout this case that Petitioner was just acting in the role . . . that he had previously formally held." Tr. of Oral Arg. 64. To the extent this is a belated argument that Percoco's leaving office was to some degree a sham, we express no view on the viability of this alternative theory of conviction in this case on the evidence presented.

ment now disclaims in *Margiotta* as good law—did not affirm on either of these theories. We decline to do so here.

\*    \*    \*

For these reasons, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE GORSUCH, with whom JUSTICE THOMAS joins, concurring in the judgment.

The Court holds that the jury instructions in this case were "too vague." *Ante*, at 330. I agree. But to my mind, the problem runs deeper than that because no set of instructions could have made things any better. To this day, no one knows what "honest-services fraud" encompasses. And the Constitution's promise of due process does not tolerate that kind of uncertainty in our laws—especially when criminal sanctions loom. "Vague laws" impermissibly "hand off the legislature's responsibility for defining criminal behavior to unelected prosecutors and judges, and they leave people with no sure way to know what consequences will attach to their conduct." *United States* v. *Davis*, 588 U. S. ——, —— (2019).

Honest-services fraud and this Court's vagueness jurisprudence are old friends. The story traces back to the early 1940s when a string of lower courts began stretching the federal mail-fraud statute's phrase "scheme or artifice to defraud." 18 U. S. C. § 1341. Everyone understood that the phrase covers efforts to swindle money or property. But some lower courts began suggesting that the phrase also sweeps in schemes to deprive others of "intangible rights," including the right to "honest services." *Skilling* v. *United States*, 561 U. S. 358, 400 (2010) (citing cases). What did this new "honest-services fraud" concept encompass? Even the lower courts that devised the theory could not agree. They

clashed over everything from who owes a duty of honest services to what sources of law may give rise to that duty to what sort of actions constitute a breach of it. See *id.,* at 416–420 (Scalia, J., concurring in part and concurring in judgment).

Eventually, that uncertainty demanded this Court's attention. In *McNally* v. *United States*, 483 U. S. 350 (1987), the Court held that, while § 1341 "clearly protects property rights," it does not protect more abstract interests like a right to "honest . . . government." *Id.,* at 355, 356. *McNally* rested, in no small part, on vagueness concerns. Any other interpretation, the Court emphasized, would leave the law's "outer boundaries ambiguous." *Id.,* at 360. If Congress wanted to extend the law to protect more than property rights, the Court added, "it must speak more clearly than it has." *Ibid.*

Soon Congress did speak. It enacted § 1346, which now defines the phrase "scheme or artifice to defraud" to include "a scheme or artifice to deprive another of the intangible right of honest services." In one sense, the new law did offer clarity. It dispelled any doubt about whether Congress intended the mail-fraud statute (and later the wire-fraud statute, § 1343) to protect a right to "honest services." But in another sense, the law clarified nothing. Congress did not address *McNally*'s concern that the phrase "honest-services fraud" is unworkably vague. Nothing in the new law attempted to resolve when the duty of honest services arises, what sources of law create that duty, or what amounts to a breach of it. Nor did the new law cross-reference any portion of the federal criminal code that might have lent clarity to the concept.

These problems resurfaced in *Skilling*. There, a majority of the Court acknowledged that a "vagueness challenge [to § 1346] ha[d] force." 561 U. S., at 405. But instead of "throw[ing] out the statute as irremediably vague," the majority elected to fill in some of the blanks. *Id.,* at 403–404.

To that end, the majority "look[ed] to the doctrine" of honest-services fraud as it had developed in the lower courts "in pre-*McNally* cases." *Id.*, at 404. Recognizing the many internal tensions in that line of cases, the majority attempted to "pare that body of precedent down to its core." *Ibid.* What exactly falls within that "core"? The majority could not say. All it could muster was that, "[i]n the main," honest-services convictions had involved "fraudulent schemes to deprive another of honest services through bribes or kickbacks supplied by a third party who had not been deceived." *Ibid.*

Justice Scalia, Justice Kennedy, and JUSTICE THOMAS declined to participate in *Skilling*'s rescue mission. They saw the Court's decision as an act of "not interpretation but invention." *Id.*, at 422 (opinion of Scalia, J.). Nothing in the statute, they observed, confined breaches of the duty of honest services to bribes or kickbacks. Indeed, not a single lower court had understood the concept to be limited in that way. *Id.*, at 423. Nor could the dissenters find anything in the judicial power permitting them to "replac[e] a vague criminal standard that Congress adopted with a more narrow one (included within the vague one)." *Id.*, at 422.

Even on its own terms, the dissenters noted, the majority's reconstruction of the statute failed "to eliminate [its] vagueness." *Id.*, at 421. The majority had not attempted to define what constitutes a breach of the " 'honest services' obligation," but sought to identify only conduct that fell within its "core." *Ibid.* Nor had the majority done anything to "solve the most fundamental indeterminacy" in honest-services-fraud theory, *ibid.*, for nothing in its decision explained what kinds of fiduciary relationships are sufficient to trigger a duty of honest services in the first place. Is the duty of honest services limited "to public officials" serving the government? *Ibid.* Does it also apply "to private individuals who contract with the public?" *Ibid.* Or does it apply to "everyone" who owes some sort of fiduciary respon-

sibility to others, including (say) a corporate officer? *Ibid.*
What source of law, too, should a court consult to answer
these questions? Must a fiduciary duty arise from positive
state or federal law, or can it arise from general trust law,
"a *corpus juris* festooned with various duties"? *Id.*, at 417–
418. All these questions, the dissenters observed, had long
divided lower courts and remained unanswered.

Today, the Court returns to these quandaries. The jury
instructions in this case sought to identify at least one in-
stance when a duty of honest services arises—namely, when
a private individual has " 'dominated and controlled any gov-
ernmental business' " and " 'people working in the govern-
ment actually relied on him because of a special relationship
he had with the government.' " *Ante*, at 330. But that for-
mulation, the Court holds, is "too vague" to pass constitu-
tional muster. *Ibid.* That is so, the Court reasons, because
it could result in the conviction of *anyone* whose "clout ex-
ceeds some ill-defined threshold" and thus sweep in "effec-
tive lobbyists" exercising their First Amendment right to
petition the government. *Ante*, at 331. The Court also
pauses briefly to address two alternative tests the govern-
ment suggests for defining when a duty of honest services
may attach. But the Court takes no view on the first and
rejects the second. *Ante*, at 332. In the end, we may now
know a little bit more about when a duty of honest services
*does not* arise, but we still have no idea when it *does*.

It's a situation that leaves prosecutors and lower courts in
a bind. They must continue guessing what kind of fiduciary
relationships this Court will find sufficient to give rise to a
duty of honest services. For them, it is back to the drawing
board in their indictments and their jury instructions. But
they are not the main victims here. That plight belongs to
private citizens. In this country, a criminal law is supposed
to provide "ordinary people fair notice of the conduct it pun-
ishes." *Johnson* v. *United States*, 576 U. S. 591, 595 (2015);

see also *Connally* v. *General Constr. Co.*, 269 U. S. 385, 391 (1926). Yet even 80 years after lower courts began experimenting with the honest-services-fraud theory, no one can say what sort of fiduciary relationship is enough to sustain a federal felony conviction and decades in federal prison.

To be sure, I cannot fault the Court for the problem. The difficulty here stems from the statute and the lower court decisions that inspired it. I have no doubt that if all nine Justices put our heads together, we could rewrite § 1346 to provide fair notice and minimize the risk of uneven enforcement. I have no doubt, too, that we could find a hook for any such rule somewhere in the morass of pre-*McNally* lower court case law. Maybe, too, that is the path we are on, effectively writing this law bit by bit in decisions spanning decades with the help of prosecutors and lower courts who present us with one option after another. But that is not a path the Constitution tolerates. Under our system of separated powers, the Legislative Branch must do the hard work of writing federal criminal laws. Congress cannot give the Judiciary uncut marble with instructions to chip away all that does not resemble David. See *United States* v. *Reese*, 92 U. S. 214, 221 (1876) ("It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large"); *United States* v. *Wiltberger*, 5 Wheat. 76, 95 (1820) (Marshall, C. J.) ("It is the legislature, not the Court, which is to define a crime, and ordain its punishment").

Doubtless, Congress had high and worthy intentions when it enacted § 1346. But it must do more than invoke an aspirational phrase and leave it to prosecutors and judges to make things up as they go along. The Legislature must identify the conduct it wishes to prohibit. And its prohibition must be knowable in advance—not a lesson to be learned by individuals only when the prosecutor comes calling or the

judge debuts a novel charging instruction. Perhaps Congress will someday set things right by revising § 1346 to provide the clarity it desperately needs. Until then, this Court should decline further invitations to invent rather than interpret this law.

Page Proof Pending Publication

## Reporter's Note

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports.  The revised pagination makes available the official United States Reports citation in advance of publication.   The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court.   A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus.   Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation.   The following additional edits were made:

None